Frank E. Scherkenbach (CA #142549)
scherkenbach@fr.com
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, Massachusetts 02210-1878
Telephone: (617) 542-5070
Facsimile:  (617) 542-8906

Howard G. Pollack (CA #162897)
pollack@fr.com
Michael R. Headley (CA #220834)
headley@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, California 94063
Telephone: (650) 839-5070
Facsimile:  (650) 839-5071

Attorneys for Plaintiff
POWER INTEGRATIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN JOSE DIVISION)

| | |
|---|---|
| Power Integrations, Inc., <br><br> Plaintiff, <br><br> v. <br><br> ON Semiconductor Corp. and Semiconductor Components Industries, LLC, <br><br> Defendants. | Case No. 16-cv-06371 BLF <br><br> **POWER INTEGRATIONS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE EXPERT OPINIONS** <br><br> Date: June 6, 2019 <br> Time: 9:00 a.m. <br> Judge: Hon. Beth L. Freeman <br> Courtroom: 3, 5th Floor |
| ON Semiconductor Corporation; and Semiconductor Components Industries, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Power Integrations, Inc., <br><br> Defendant. | Case No. 3:17-cv-03189 BLF |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION ................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

I.      INTRODUCTION .......................................................................... 1

II.     LEGAL STANDARD ...................................................................... 1

III.    MSJ #1: PRIVITY AND ISSUE PRECLUSION ............................... 1

IV.     MSJ #2: IPR ESTOPPEL .............................................................. 6

V.      MSJ #3: ANTICIPATION OF THE '862 AND '908 PATENTS ................ 8

VI.     MSJ #4: NONINFRINGEMENT OF THE '601 PATENT ........................ 13

VII.    MSJ #5: NONINFRINGEMENT OF THE '272 PATENT ........................ 18

VIII.   MSJ #6: NONINFRINGEMENT OF THE '933 PATENT ........................ 19

IX.     MSJ #7: NONINFRINGEMENT OF THE '624 PATENT ........................ 20

X.      MSJ #8: NO WILLFUL INFRINGMENT ........................................ 22

XI.     CONCLUSION ............................................................................. 22

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AstraZeneca UK Ltd. v. Watson Laboratories, Inc.*,
   905 F. Supp. 2d 596 (D. Del. 2012) ................................................................. 4, 6

*Brunswick Corp. v. Chrysler Corp.*,
   408 F.2d 335 (7th Cir. 1969) ......................................................................... 4, 5, 6

*Elan Microelectronics Corp. v. Apple, Inc.*,
   No. C 09-01531 RS, 2010 U.S. Dist. LEXIS 122011 (N.D. Cal. Nov. 1, 2010) ......................... 4

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010) ............................................................................ 15

*F.T.C. v. Publishing Clearing House, Inc.*,
   104 F.3d 1168 (9th Cir. 1997) ............................................................................. 15

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
   2015 WL 1905871 (D. Del. 2015) ...................................................................... 3, 6

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
   2015 WL 3630000 (N.D. Cal. 2015) (Freeman, J.) ................................. 1, 15, 16, 17

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
   2015 WL 3640694 (N.D. Cal. 2015) (Freeman, J.) ......................................... 17, 20

*Finjan, Inc. v. Cisco Systems Inc.*,
   2017 WL 2462423 (N.D. Cal. 2017) (Freeman, J.) ............................................... 22

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
   136 S. Ct. 1923 (2016) .......................................................................................... 22

*Kloster Speedsteel AB v. Crucible Inc.*,
   793 F.2d 1565 (Fed. Cir. 1986) ...................................................................... 4, 5, 6

*Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997) ............................................................................ 16

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) .................................................................................. 4

*Roche Palo Alto LLC v. Apotex, Inc.*,
   526 F. Supp. 2d 985 (N.D. Cal. 2007) ................................................................ 4, 6

*XpertUniverse, Inc. v. Cisco Systems, Inc.*,
   Case No. 17-cv-03848-RS (N.D. Cal. May 8, 2018) ............................................... 6

1

## TABLE OF AUTHORITIES (cont'd.)

2

**Page(s)**

3

**Statutes**

4

35 U.S.C. § 102(b) ................................................................................................................ 13

5

35 U.S.C. § 312 ...................................................................................................................... 7

6

35 U.S.C. § 315(e)(2) ............................................................................................................. 7

7

**Other Authorities**

8

Civ. L.R. 3-1 .......................................................................................................................... 1

9

Civ. L.R. 37 ........................................................................................................................... 1

10

Civ. L.R. 56 ........................................................................................................................... 1

11

Fed. R. Civ. P. 26 ............................................................................................................ 1, 19

12

Fed. R. Civ. P. 37 .................................................................................................................. 1

13

Fed. R. Civ. P. 56 .................................................................................................................. 1

14

H.R. Rep. No. 112-98, pt. 1 (2011) ....................................................................................... 7

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POWER INTEGRATIONS' MOTION FOR SUMMARY JUDGMENT
AND MOTION TO STRIKE EXPERT OPINIONS

## NOTICE OF MOTION

TO THE COURT AND ALL COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Plaintiff Power Integrations, Inc. ("PI") hereby moves the Court for summary judgement that ON is precluded from challenging the validity of PI's '876 and '079 patents; that ON's '862 and '908 patent are invalid as anticipated by PI's own SMP3 product; that PI does not infringe ON's '601, '272, '933, and '624 patents; and that PI does not willfully infringe any asserted ON patent.  PI also moves to strike the infringement opinions of Defendants' expert Dr. Madisetti to the extent those opinions were not disclosed in ON's infringement contentions.  This motion is made pursuant to FRCP 26, 37, 56; Civil Local Rules 37 and 56; and Patent Local Rule 3-1.  This motion is noticed for hearing on Thursday, June 6, 2019, at 9:00 a.m., per the Court's scheduling order dated June 5, 2017, before United States District Judge Beth L. Freeman, in Courtroom 3, 5th Floor, 280 South 1st Street, San Jose, CA 95113.

This motion is based upon this notice and motion, the accompanying points and authorities, the declaration and exhibits in support hereof, any reply papers which may be filed, and such other matters as may be brought before the Court prior to or at the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

PI seeks summary judgment on several discrete issues in order to streamline the case for trial.

### II.    LEGAL STANDARD

The Court is familiar with the summary judgment standard, so PI will not repeat it here. *E.g.*, *Finjan, Inc. v. Blue Coat Systems, Inc.*, 2015 WL 3630000, at *3-4 (N.D. Cal. 2015) (Freeman, J.) (hereafter, "*Finjan I*") (granting-in-part and denying-in-part motions).

### III.    MSJ #1: PRIVITY AND ISSUE PRECLUSION

Shortly before this case was filed, Defendants (hereafter, "ON") acquired Fairchild Semiconductor, a company previously found to infringe two of the patents that PI asserts in this case, the '876 patent and the '079 patent (U.S. Patents 6,249,876 and 6,212,079, attached as Exs. 1-2).  Of particular importance to this motion, Fairchild also sought to invalidate the '876 and '079

1  patents in the previous litigation and lost.  Final judgments of no invalidity have been entered

2  against Fairchild for the '876 and '079 patents.

3          As a result of this past litigation, a critical issue in this case is whether ON is bound by the

4  judgments against its subsidiary Fairchild.  PI pled affirmative defenses of issue preclusion for

5  both patents.  (*See* Dkt. No. 100 at page 19, ¶¶ 200-202 ('876 patent); Dkt. No. 103 at pages 10-

6  11, ¶¶ 5-7 ('079 patent).)  PI also filed a motion to dismiss ON's validity challenge to the '876

7  patent on grounds of issue preclusion.  (Dkt. No. 55 at 11-12.)  In response, ON denied that issue

8  preclusion applied, focusing on one of the relevant factors ("the person against whom collateral

9  estoppel is asserted in the present action was a party or in privity with a party in the previous

10  action").  (Dkt. No. 63 at 12.)  The Court denied PI's motion without prejudice, holding that facts

11  beyond the pleadings would be required:

12          Other than the SAC's allegation that ON and Fairchild Semiconductor
        merged, there is no evidence to support PI's argument that the transaction
13      between ON and Fairchild Semiconductor created privity.  Thus, PI's challenge to
        ON's claim for declaratory judgment of invalidity of the '876 patent cannot be
14      decided based on the current record.  The Court therefore DENIES PI's motion to
        dismiss ON's claim for declaratory judgment of invalidity of the '876 patent
15      WITHOUT PREJUDICE.

16          During oral argument, PI suggested that it could bring a Rule 12(c) motion
        to challenge ON's claim for declaratory judgment of invalidity of the '876 patent.
17      Oral Arg. Tr. 20:3–5.  Upon reflecting the parties' arguments, the Court considers
        that this issue may be more appropriately addressed by a motion for summary
18      judgment.

19  (Dkt. No. 92 at 10.)

20          PI hereby moves for summary judgment that ON is precluded from challenging the validity

21  of the '876 and '079 patents in this case.  PI supports this motion with evidence not usable at the

22  motion to dismiss stage, including: (1) the agreement and plan of merger entered between ON and

23  Fairchild on November 18, 2015 (Ex. 3); (2) the confidentiality agreement entered between ON

24  and Fairchild on September 14, 2015 (Ex. 4); (3) an ON press release announcing the closure of

25  the merger on September 19, 2016 (Ex. 5); (4) an ON document stating that, after the merger,

26  "Fairchild surviv[ed] as a wholly-owned subsidiary of ON Semiconductor Corporation." (Ex. 6  at

27  2); (5) the Federal Circuit decision affirming judgment against Fairchild that the '876 patent is not

28  invalid, decided December 12, 2016 (Ex. 7); (6) final judgment against Fairchild that the '079

patent is not invalid, entered March 10, 2017 (Ex. 8); (7) Fairchild's opening appeal brief not

challenging the '079 validity judgment, filed July 5, 2017 (Ex. 9); and (8) evidence that ON filed

twelve *inter partes* reviews in the PTO on behalf of Fairchild in 2016—after the parties agreed to

merge but before the merger closed (*see* Ex. 10).[1]

The ON/Fairchild merger agreement (Ex. 3) spells out not merely an offer but a detailed

136-page *agreement* to merge.  While there were conditions precedent to closure, conditions exist

in nearly every contract.  Moreover, upon satisfaction of those conditions, the agreement

definitively states that "Acquisition Sub *shall be merged* with and into the Company."  (Ex. 3, §

2.1, emphasis added.)  In other words, the merger agreement created a contractual relationship

between ON and Fairchild on the day it was signed on November 18, 2015.  Therefore, at least as

of that date, the parties were acting in collaboration on and in furtherance of the merger, and

assumed the conditions precedent would indeed be satisfied.

In addition, even before the merger agreement, ON and Fairchild entered into another

contract, a confidentiality agreement dated September 14, 2015 (Ex. 4).  This agreement stated

that ON and Fairchild "share a common legal and commercial interest" and "are or may become

joint defendants."  (*Id.* at ¶ 16.)

In 2016, after ON and Fairchild entered their confidentiality and merger agreements, but

before the merger closed, ON filed twelve *inter partes* reviews in the PTO, regarding PI patents

that *Fairchild* (not ON) had been found to infringe or had been sued for infringing.  (Ex. 10.)

The merger then closed on September 19, 2016, making ON and Fairchild one company.

(Ex. 5.)  *Thereafter*, the Federal Circuit affirmed the judgment finding the '876 patent invalid, this

District entered judgment that the '079 patent was not invalid, and Fairchild/ON decided not to

appeal the '079 validity judgment.  (Ex. 6.)

These facts are sufficient to find that ON is precluded from challenging the validity of the

'876 and '079 patents in this case.  Issue preclusion "bars relitigation of issues adjudicated in an

---

[1] In addition, PI expects to obtain yet more evidence before this motion is decided.  ON has
resisted providing discovery concerning its relationship with Fairchild, and PI has filed a
discovery dispute letter with Magistrate Judge DeMarchi, with hearing set before the hearing on

earlier proceeding if three requirements are met: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party *or in privity with a party* at the first proceeding." *Roche Palo Alto LLC v. Apotex, Inc.*, 526 F. Supp. 2d 985, 994 (N.D. Cal. 2007) (emphasis added, holding that issue preclusion barred patent invalidity claim); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006).

Here, the validity issues in this case are the same as were previously litigated, as they involve the same asserted claims: claims 1 and 21 of the '876 patent and claims 31, 34, 38 and 42 of the '079 patent. (Ex. 7 at 1325); Ex. 8 at 2.)[2]  The previous proceedings ended in final judgments on the merits.  And, as of at least September 19, 2016, ON admittedly was in privity with Fairchild.  That means ON is barred in the same way Fairchild is.  *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1583 (Fed. Cir. 1986) ("Courts have repeatedly found privity where, after a suit begins, a nonparty acquires assets of a defendant-infringer."); *Brunswick Corp. v. Chrysler Corp.*, 408 F.2d 335, 338 (7th Cir. 1969) (acquiring company was precluded from challenging validity after it bought all the assets of another company that was estopped); *Elan Microelectronics Corp. v. Apple, Inc.*, No. C 09-01531 RS, 2010 U.S. Dist. LEXIS 122011, at *9-11 (N.D. Cal. Nov. 1, 2010) (finding successor-in-interest in privity); *AstraZeneca UK Ltd. v. Watson Laboratories, Inc.*, 905 F. Supp. 2d 596, 603 (D. Del. 2012) ("Given that Cobalt is precluded from relitigating the issue of validity, Watson is also precluded as Watson is Cobalt's successor in interest.").

ON will doubtless argue that it never had its day in court, and that PI had previously accused ON itself of infringing the '876 and '079 patents in a 2014 email.  However, as this Court observed at the claim construction hearing, "when you acquire a company, you take it, warts and all." (9/21/18 Tr at 21:14-15.)  In addition, it is not really true that ON never had a chance to

---

dispositive motions, and Judge Stark has already ordered ON to provide parallel discovery in the parties' co-pending case in Delaware.  (*See* Dkt. No. 218.)

[2] If ON argues '876 claims 14-15 are materially different, ON is precluded from challenging the validity of those claims for another reason discussed in the next section: IPR estoppel.

POWER INTEGRATIONS' MOTION FOR SUMMARY JUDGMENT
AND MOTION TO STRIKE EXPERT OPINIONS
Case Nos. 16-cv-06371-BLF and 17-cv-03189 BLF

control the prior litigation.  ON began acting in concert with Fairchild on PI patent matters by September 14, 2015 (the date of the confidentiality agreement), more than a year before the Federal Circuit affirmed the validity of the '876 patent on  December 12, 2016, and the merger closed ON September 19, 2016, nine months before Fairchild/ON decided not to appeal validity of the '079 patent on July 5, 2017.  Notably, ON did not seek to invalidate PI's patents in response to the 2014 email; it did so only after it agreed to acquire Fairchild.  The following timeline makes this clear:

- 4/27/12 Jury finds '876 patent valid and that Fairchild infringes (Ex. 11)
- 3/4/14 Jury finds '079 patent valid and that Fairchild infringes (Ex. 12)
- 6/16/14 PI emails ON about infringement of PI patents (Dkt. No. 94-5 Ex. J)
- 9/14/15 ON and Fairchild enter confidentiality agreement (Ex. 4)
- 11/18/15 ON and Fairchild agree to merge (Ex. 3)
- 3/29/16 ON files '079 IPR, the first of 12 IPRs filed for Fairchild (Ex. 14)
- 9/19/16 ON/Fairchild merger closes (Ex. 5)
- 12/12/16 Federal Circuit affirms '876 validity judgment (Ex. 7)
- 3/10/17 NDCA enters final '079 validity judgment (Ex. 8)
- 7/5/17 ON/Fairchild decide not to appeal '079 validity (Ex. 9)

Moreover, the case law is rife with examples demonstrating that a successor-in-interest may have its rights limited post-merger based on the property that it acquired, as demonstrated by the cases cited above.  ON's argument that it was not a party to the previous litigation also misses the point of privity.  ON *is* Fairchild, and the law does not permit the combined entity to burden the courts (and PI) with another challenge to the validity of the '876 and '079 patents.  If Fairchild had acquired ON and kept the name "Fairchild," there would be no question that it could not resurrect its invalidity defense.  The result should be no different simply because Defendants have chosen to use the name ON rather than Fairchild for the combined entity.

In previous briefing on this issue, ON has also misread the cited cases with regard to timing of the acquisition.  In *Brunswick*, which was cited with approval by the Federal Circuit in *Kloster Speedsteel*, 793 F.2d at 1583, the acquiring company was precluded from challenging

1   validity after it bought all the assets of another company that was estopped, even though the

2   acquiring company was not itself involved in the earlier litigation.  *Brunswick*, 408 F.2d at 338.

3   Likewise, in *Kloster* itself, the successor company was held bound even though it did not come

4   into existence until after the earlier trial.  *Kloster*, 793 F.2d at 1569.

5          ON will also likely argue that this case involves different accused products, but that is not

6   relevant to whether patent validity is subject to issue preclusion.  As this Court also stated at the

7   claim construction hearing, "I'm not concerned about the products right now, I'm only concerned

8   with the patent."  (9/21/18 Tr. at 20:15-16.)  Validity is the same as claim construction; it relates to

9   *the patents*, not the accused products.  In other words, ON confuses preclusion *for infringement*

10  with preclusion *for validity*.  The latter nearly *always* arises in subsequent litigation in which

11  different products are accused.  The bottom line is that a successor has no more rights than the

12  acquired party.  *Kloster Speedsteel* 793 F.2d at 1583.

13         Finally, ON may argue that it asserts different prior art in this case.  However, since

14  validity is a "single issue" for issue preclusion, the fact that different prior art is being asserted is

15  of no moment, as courts in this District have repeatedly held.  *E.g.*, *Roche*, 526 F. Supp. 2d at 994-

16  95 ("Applying Ninth Circuit precedent, *Applied* found that issue preclusion barred the accused

17  infringer not only from re-raising any grounds on which it had argued invalidity in the first

18  litigation, but also the invalidity grounds newly raised in the second litigation, such as prior art

19  anticipation and obviousness.  District courts from around the country are in agreement with the

20  result reached in *Applied*.") (internal citations omitted); *XpertUniverse, Inc. v. Cisco Systems, Inc.*,

21  Case No. 17-cv-03848-RS (N.D. Cal. May 8, 2018); *see also Fairchild Semiconductor Corp. v.*

22  *Power Integrations, Inc.*, 2015 WL 1905871, at *2 (D. Del. 2015);.*Astrazeneca*, 905 F. Supp. 2d

23  at 602-603.

24         Therefore, this Court should enter partial summary judgment that ON is precluded from

25  challenging the validity of the '876 and '079 patents in this case.

26  **IV.    MSJ #2: IPR ESTOPPEL**

27         In establishing *inter partes* reviews (IPRs), Congress was mindful not to burden patent

28  owners with serial validity challenges:

> The Committee recognizes the **importance of quiet title to patent owners to ensure continued investment resources**.  While this amendment is intended to remove current disincentives to current administrative processes, the changes made by it are **not to be used as tools for harassment** or a means to prevent market entry t**hrough repeated litigation and administrative attacks on the validity of a patent**.  Doing so would frustrate the purpose of the section as providing quick and cost effective alternatives to litigation.  Further, such activity **would divert resources from the research and development of inventions**.  As such, the Committee intends for the USPTO to address potential abuses and current inefficiencies under its expanded procedural authority.

H.R. Rep. No. 112-98, pt. 1, at 48 (2011) (emphasis added).  35 U.S.C. § 315(e)(2) therefore provides that if the PTO issues a final written decision on a patent claim in an IPR, the petitioner "may not assert" in a civil action "that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that *inter partes* review."   In this case, ON filed IPRs relating to both the '876 and '079 patents, and final written decisions were issued for claims 14-15 of the '876 patent and all asserted claims of the '079 patent.  (Exs. 15-16.)  While these decisions are on appeal, the estoppel provided for in the statue has already been triggered because the same prior art was available or actually asserted in both this case and the IPRs.  For '876 patent claims 14-15, ON's expert Dr. Madisetti relies upon the following prior art: Jones, Handbook, Stone, Dobkin, and Manlove.  (Ex. 17, Madisetti invalidity report, at 184-193.)  The PTO issued a final written decision on these claims regarding Dobkin, Stone, and Manlove (Ex. 15), and there is no reason that ON could not have reasonably raised Jones and Handbook, which are a publicly available U.S. patent/application and a textbook, respectively.  For '079 claims 31, 34, 38, and 42, Dr. Madisetti relies upon Oda and datasheets for the UCC3858 product.  (Ex. 17, Madisetti invalidity report, at 43-91.)  The PTO issued a final written decision on these claims regarding Oda (Ex. 16), and there is no reason that ON could not have reasonably raised the UCC3858 datasheets, which Dr. Madisetti states "were published and publicly available on the date listed on the datasheet."  (Ex. 17, Madisetti invalidity report, at 43.)  While Dr. Madisetti asserts that the UCC3858 *product* also invalidates the '079 patent—and the PTO will not consider product prior art—Dr. Madisetti's report cites only the public UCC3858 datasheets, which *could* have been submitted to the PTO.  35 U.S.C. § 312.

1    Therefore, independent of the privity/issue preclusion issue, the Court should therefore

2  grant summary judgment that ON is statutorily precluded from challenging the validity of claims

3  14-15 of the '876 patent and all asserted claims of the '079 patent.

4  **V.    MSJ #3: ANTICIPATION OF THE '862 AND '908 PATENTS**

5    This litigation is not the first time the parties have had a patent dispute; in the late 1990s,

6  ON's predecessor Motorola was found to have copied PI's patented technology, in *Power*

7  *Integrations, Inc. v. Motorola, Inc.*, USDC Del. Case No. CA98-490-JJF.

8    The story begins in the early 1990s, when Motorola's Semiconductor Products Sector

9  ("SPS")—ON's predecessor—decided it was not a "player" in the market for high-voltage

10  semiconductor switching devices but needed to be. (Ex. 18, *Power Integrations, Inc. v. Motorola,*

11  *Inc.*, USDC Del. Case No. CA98-490 JJF, Trial Transcript ("Tr.") 184:6-17 (Jefferson Hall,

12  Motorola Design Manager for High Voltage Products, testifying that in 1993, Motorola didn't

13  have high voltage products); *id.* at 685:4-24 (Douglas Domke, Motorola Operations Manager,

14  Analog Business Operation); *id.* at 929:6-20, 952:4-20, 954:20-957:17 (Ben Adamo, Motorola

15  Operations Manager, Advanced Power Business).)  As part of its strategy to expand into this

16  business, Motorola began by investigating the products of competitors.  One such competitor

17  Motorola rapidly focused its attention on was Power Integrations.  (*Id.* at 952:21-954:7 (Adamo).)

18    At that time, in the early 1990s, PI was a relatively new company, still in the "start-up"

19  phase.  (*Id.* at 128:23-130:12 (PI Inventor and current President and CEO Balu Balakrishnan).)

20  But PI had a unique new technology for making high-voltage switching power supply products

21  and had begun to get critical acclaim for its innovations in the technical literature.  Some of PI's

22  early devices were the "SMP" series of PWM (pulse width modulation) controller chips, including

23  the SMP3 and the SMP211 (both released in the early 1990s).  (*Id.* at 132:10-22 (Balakrishnan).)

24  The SMP parts were among the first to integrate a PWM power supply controller within the same

25  semiconductor integrated circuit with a high-voltage power transistor.  The SMP series also

26  included some additional features in the controller, such as line under-voltage/over-voltage

27  protection and latching shutdown.

28

POWER INTEGRATIONS' MOTION FOR SUMMARY JUDGMENT
AND MOTION TO STRIKE EXPERT OPINIONS
Case Nos. 16-cv-06371-BLF and 17-cv-03189 BLF

1    Motorola obtained samples of PI's SMP products, tested their performance, and reverse

2  engineered their internal circuitry.  (*Id.* at 184:18-188:19 (Hall); Tr. 1599:19-1600:14 (Eric

3  Tisinger, Motorola IC Designer, High Voltage Products).)  Thereafter, Motorola's engineers added

4  a "Programmable State Controller" feature to Motorola's MC3337x product.  (*See* Ex. 19,

5  MC3337x datasheet.)  PI's SMP products, which Motorola had reverse engineered, contained

6  fundamentally the same feature.  (*See* Ex. 20, SMP3 datasheet at 1-1.)

7    Because the MC3337x was a drop-in replacement for PI's TOPSwitch products, and

8  because Motorola priced it aggressively on its release, Motorola took significant sales and

9  customers from PI and forced PI to drastically reduce its prices on TOPSwitch.  (Ex. 18 at 391:19-

10  392:3; 417:15-422:12 (Earhart); Tr. 498:11-500:17, 511:3-512:12, 514:21-516:13 (Selleck).)  And

11  because of the substantial lost sales and price erosion suffered by PI after the introduction of the

12  copied MC3337x product, PI sued Motorola for patent infringement in the District of Delaware.

13  (*Id.* at 429:12-19 (Earhart).)  On October 15, 1999, a jury returned a verdict finding that Motorola

14  had willfully infringed PI's US Patent No. 5,313,381 with its MC3337x products, and awarded PI

15  $32.3 million in damages.  (Ex. 21.)  That case subsequently settled.  Toward the end of the

16  parties' litigation, Motorola also sold its SPS division, and that business became known as ON

17  Semiconductor.  (*Id.* at 425:23-427:15; 429:4-11 (Earhart).)

18    Of particular relevance to this motion, Motorola patented the State Controller feature in its

19  MC3337x product—without disclosing Power Integrations' prior art SMP devices to the PTO

20  during prosecution.  The result was U.S. Patent No. 5,859,768, which subsequently became the

21  subject of the three ON reissue patents asserted here: the '862 and '908 patents and RE39,933.

22    In this motion, PI demonstrates that its SMP3 product anticipates the asserted claims of

23  the '862 and '908 patents (RE45,862 and RE41,908, attached as Exs. 22-23).  Anticipation by the

24  SMP3 is not surprising, because the SMP3 products included the feature that Motorola reverse

25  engineered, copied, and later patented, claiming it was allegedly ON's own "State Controller"

26  invention.

27    PI's SMP3 product (PWR-SMP3) was an integrated circuit for power supply applications

28  and was designed and sold by Power Integrations in the early 1990s.  (Ex. 20, SMP3 Datasheet at

1-1.)  The SMP3 Chip and its features and design are disclosed in the SMP3 Datasheet (Ex. 20) and in design schematics (Ex. 24).  The SMP3 datasheet is evidence of the structure, function and operation of the SMP3 integrated circuit device as it was sold, publicly known and used more than one year before the priority date of the '862 and '908 patents.  Further evidence that the SMP3 integrated circuit was publicly known and used can be found in the documentation related to the SMP3 Evaluation board.  (*E.g.*, Ex. 25.)

The SMP3 Datasheet discloses a power converter using an SMP3 controller IC: "The PWR-SMP3, intended for off-line isolated power supply applications."  (Ex. 20, SMP3 Datasheet at 1-1.)  This is illustrated in Figure 1:



*Figure 1.  Typical Application*

(*Id.* at Figure 1 (Typical application); *see also id.* at Figure 4 (example complete converter).)

The SMP3 "combines a high voltage power MOSFET switch with a switch mode power system controller in a monolithic integrated circuit."  *Id.* at 1-1.  The SMP3 contains numerous features and requires only a few external components to implement a power supply.  *Id.*

For example, the SMP3 includes over- and under-voltage lockout features:

1

2

3

4

5

6

7

8



9   *Id.* at Fig. 3.  The schematics of the SMP3 chip also show the detailed implementation of the

10  control circuit inside the SMP3 chip.  For example, the top level schematic of the chip, reproduced

11  below (with a more readable version in the exhibit), shows the oscillator (osc), PWM comparator

12  (fcomp) and associated logic (out_logic), 9 (detailed oscillator), 11 (detailed PWM comparator),

13  and 12 (out_logic):

14

15

16

17

18



19

20

21

22

23

24  (Ex. 24, SMP3 Schematics at sheet 1.)  These blocks are shown on the top-level; the details within

25  each block are shown in the listed pages (9, 11 and 12) of the exhibit.

26          In the SMP3, the "Undervoltage/Overvoltage Lockout disables the power switch when the

27  input voltage is either loo low or too high."  (Ex. 20, SMP3 Datasheet at 1-3.)  The over and

28  undervoltage reference voltages can be set with a resistor divider attached to the UV/OV input pin.

1    *Id*.  The SMP3 includes "Fault Detection" circuitry configured to prevent the control signal from

2    switching only during a value of a state control signal received at the OV/UV pin.  (Ex. 26,

3    Hassoun Expert Report at ¶ 96.)

4            Asserted claim 28 of the '908 patent and asserted claims 30 and 35 of the '862 patent cover

5    just this functionality and, therefore, are invalid as anticipated by the SMP3 product.  (Ex. 26,

6    Hassoun Expert Report at ¶¶ 135, 139; Ex. 27, Hassoun Exhibit HAS05; Ex. 28, Hassoun Exhibit

7    HAS09.)  For example, like claim 28 of the '908 patent, the "OV/UV terminal" in the SMP3

8    product was "a terminal adapted for receiving a mode control signal which controls an on-state

9    and off-state of the power supply regulator circuit."  (Ex. 27, Hassoun Exhibit HAS05 at 2.)  The

10   SMP3 also included "a first comparator having an input coupled to the terminal for receiving the

11   mode control signal (OV/UV), and an output ('F' / 'LINE_OV') having first or second states

12   depending on a comparison between the mode control signal and a first reference value (1.25V)."

13   (*Id*. at 4.)  This is referred to as the "Input OV Trip-off in the SMP3 Datasheet."  (*Id*.)  The SMP3

14   also included "a second comparator having an input coupled for receiving the mode control signal

15   (OV/UV), and an output ('G' / 'LINE_UV') having first or second states depending on a

16   comparison between the mode control signal and a second reference value (0.34V) (referred to as

17   'Input UV Trip-off' in the SMP3 datasheet) which is different from the first reference value."  (*Id*.

18   at 6.)  Furthermore, the SMP3 included "a logic circuit (within 'FAULT DETECTION' block in

19   the SMP3 Datasheet, 'fault_prot_logic' in the schematic) having a first input coupled to the output

20   of the first comparator, and a second input coupled to the output of the second comparator."  (*Id*.

21   at 8.)  Finally, the SMP3 included "a PWM regulator circuit having a first input coupled for

22   receiving a feedback signal ('EA-'), a second input coupled for receiving an operating potential

23   ('VBIAs'), an output for providing a switching signal (input to 'GATE DRIVER') in response to

24   the feedback signal and a control input (input to NAND gate) coupled to an output of the logic

25   circuit ('NO_FAULT L') for setting the power supply regulator circuit to an operational state or

26   non-operational state."  (*Id*. at 11.)  Claims 30 and 35 of the '862 patent are similar and also

27   anticipated by the SMP3 product.  (*See* Ex. 28, Hassoun Exhibit HAS09.)

28

1    Under the applicable version of 35 U.S.C. § 102(b), a patent claim is invalid if "the

2    invention was patented or described in a printed publication in this or a foreign country or in

3    public use or on sale in this country, more than one year prior to the date of the application for

4    patent in the United States."  The '908 and '862 patents claim an effective filing date of June 4,

5    1997.  (Exs. 22-23, 29.)  The SMP3 datasheet is dated July 1991, and the SMP3 was in public use

6    more than one year before the effective filing date.  (Ex. 20.)

7    The Court should therefore grant partial summary judgment that the asserted claims of the

8    '908 and '862 patents are invalid as anticipated by PI's SMP3 product.

9    **VI.    MSJ #4: NONINFRINGEMENT OF THE '601 PATENT**

10    The Court is familiar with ON's '601 patent (U.S. patent 7,447,601, attached as Ex. 30)

11    from clam construction.  It claims a power supply controller that prevents damage by regulating

12    output voltage.  The Court largely adopted PI's construction of "form drive pulses to regulate the

13    output voltage" as "form drive pulses that are used to maintain the output voltage substantially at a

14    desired value."  (Dkt. No. 196 at 9-12.)

15    The PI products that ON accuses of infringing the '601 patent—PI's LYTSwitch-3 and

16    LYTSwitch-5 product families—are not even in the same ballpark as the '601 patent.  That is

17    because they regulate output *current*, not output voltage.  This is made clear both by PI's technical

18    datasheets and by the testimony of its knowledgeable engineer.  For example, the datasheet for the

19    LYTSwitch-3 family is entitled "Single-Stage LED Driver IC with Combined PFC and ***Constant***

20    ***Current Output*** for Outstanding TRIAC Dimming in Isolated and Non-Isolated Topologies."  (Ex.

21    31 at 1.)  The datasheet repeatedly describes the products as having constant output *current*.  (*E.g.*,

22    *id.* at 1 ("The LYTSwitch™-3 family is ideal for single-stage power factor corrected constant

23    current LED bulbs and downlighters."), 5 ("The output can drive an LED load from 68 V to 76 V

24    with a constant output current of 115 mA ±3% . . . ."), 6 ("In order to maintain very tight output

25    current regulation – within ±3%, the FEEDBACK (FB) pin voltage (with an appropriately selected

26    low-pass filter comprising RlS and C8) is compared to a preset average feedback voltage (V, 6) of

27    300 mV.").  The datasheet for the LYTSwitch-5 family is similar.  (Ex. 32.)

28

1    By contrast, neither datasheet ever mentions maintaining constant output *voltage*.  PI's

2  technical witness, Roland Saint-Pierre, explained why: the LYTSwitch-3 and LYTSwitch-5 are

3  intended for LED (light emitting diode) light bulbs, and such lights need constant current rather

4  than constant voltage:

5

6

7

8

9

10

11

12

13

14

15

16



(Ex. 33, Saint-Pierre Dep. Tr., at 189:5-190:14 (emphasis added, objections omitted); *see also id.*

17  at 197:11-24, 203:24-204:6, 211:20-212:20.)  ON asked Mr. Saint-Pierre whether voltage for

18  LEDs could be regulated instead, and he explained that the answer was no:

19

20

21

22



23  (*Id.* at 191:6-12.)

24    ON's infringement contentions for the '601 patent contain no evidence that the accused

25  products "form drive pulses that are used to maintain the output voltage substantially at a desired

26  value."  (*See* Ex. 34, Appendix G-1 to ON's Contentions, at 10-12; Ex. 35, Appendix G-2 to ON's

27  Contentions, at 10-13.)  They simply contain the bare assertion "on information and belief" that

28  "the drive pulses that are formed regulate the output voltage, or in the alternative under the

1    doctrine of equivalents, the equivalent output current." (Ex. 34 at 10; Ex. 35 at 11.) Such a

2    conclusory assertion cannot survive summary judgment, particularly when PI has submitted

3    unrebutted evidence to the contrary. *E.g., Finjan I*, 2015 WL 3630000, at *11 (conclusory

4    assertions without specific facts insufficient to create genuine dispute or avoid summary

5    judgment); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1337 (Fed. Cir. 2010) ("The

6    requirement that the nonmovant must set forth 'specific facts' means that '[m]ere denials or

7    conclusory statements are insufficient' to survive summary judgment."); *F.T.C. v. Publishing

8    Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit,

9    lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of

10   material fact.").

11        ON will likely attempt to go beyond its infringement contentions by citing to the report of

12   its expert, Dr. Madisetti, served April 25, 2019. This should be rejected, both because Dr.

13   Madisetti fails to raise a genuine dispute of material fact, and because the Court should strike his

14   report to the extent it contains infringement theories not found in ON's contentions.

15        First, with regard to the merits, Dr. Madisetti argues that constant current implies constant

16   voltage given Ohm's Law—which says that voltage equals current multiplied by resistance—and

17   asserts that LED lights exhibit "essentially linear current-voltage characteristics" and that "at

18   voltage values above the turn-on voltage of the LEDs, the voltage across and current through the

19   LEDs will follow Ohm's law." (Ex. 36, Madisetti Appendix G-1) at 13.) However, Dr. Madisetti

20   offers no evidence that LED lights follow Ohm's law, and in fact it is widely recognized that

21   diodes (including light emitting diodes, or LEDs) are *non-Ohmic*. For example, one Internet

22   reference explains "LEDs are what's known as a 'non-ohmic' devices. This means that the

23   equation for the current flowing through the LED itself is not as simple as V=IR." (Ex. 37,

24   (Sparkfin).) Other references say the same. (*E.g.*, Ex. 38 ("Many electrical elements, such as

25   diodes and batteries do not satisfy Ohm's law. These are called non-ohmic or non-linear, and their

26   I–V curves are not straight lines through the origin.") (Wikipedia); Ex. 39 (listing LEDs under

27   "Non-ohmic Devices") (physicsnet); Ex. 40 ("Any Electrical device or component that obeys

28   'Ohms Law' that is, the current flowing through it is proportional to the voltage across it ( I α V ),

1   such as resistors or cables, are said to be 'Ohmic' in nature, and devices that do not, such as

2   transistors or diodes, are said to be 'Non-ohmic' devices.") (electronic-tutorials).

3   　　In addition, PI's technical witness and expert explained that LED lights have variable

4   voltage and are non-Ohmic.  (Ex. 33, Saint-Pierre Dep. Tr., at 190:16-19 (LEDs exhibit variable

5   voltage); Ex. 41, McAlexander report, at ¶¶ 256-258 ("It is important to note, however, that many

6   circuit elements, unlike resistors, do not follow ohm's law.  These are called 'non-ohmic'

7   elements.  That is, Ohm's law does not apply to them and the associated current and voltage are

8   not linearly related—in fact, they may not be related at all.  One such device is the LED, or light

9   emitting diode.").  Dr. Madisetti's conclusory assertion to the contrary is not sufficient to create a

10  genuine dispute of material fact.  *E.g.*, *Finjan I*, 2015 WL 3630000, at *11 (expert's conclusory

11  arguments insufficient to avoid summary judgment); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d

12  1565, 1571 (Fed. Cir. 1997) (affirming summary judgment of obviousness because statements of

13  patentee's expert were conclusory and thus failed to raise a genuine issue of material fact).

14  　　Dr. Madisetti's fallback arguments fare no better.  He says "In addition, the LYTSwitch-3

15  is designed to monitor the output voltage, detect output overvoltage conditions (i.e., 30% above

16  nominal output voltage), and disable switching to prevent the output voltage from rising above this

17  value."  (Ex. 36, Madisetti Appendix G-1, at 14.)  It is notable that Dr. Madisetti never says that

18  this overvoltage protection satisfies the claim language, and clearly it does not: shutting off is not

19  the same as *maintaining* constant voltage (even if a 30% variation were considered constant,

20  which it is not).  Dr. Madisetti next states that "the Data Sheet describes a buck-boost power

21  supply using the LYTSwitch-3 that can 'drive an LED load from 70 V to 80 V.'"  (Ex. 36,

22  Madisetti Appendix G-1, at 15.)  Dr. Madisetti's suggestion that this meets the Court's claim

23  construction is unsupported.  The fact that the accused products may be used with LED lights that

24  use a particular range of voltages is not proof that the accused products contain any circuitry to

25  "form drive pulses that are used to maintain the output voltage substantially at a desired value."

26  Finally, Dr. Madisetti argues infringement under the doctrine of equivalents, saying "The

27  LYTSwitch-3 circuit performs substantially the same function (e.g., regulating the output from a

28  power supply to the load) in substantially the same way (e.g., in response to a power signal and

16   POWER INTEGRATIONS' MOTION FOR SUMMARY JUDGMENT
     AND MOTION TO STRIKE EXPERT OPINIONS
     Case Nos. 16-cv-06371-BLF and 17-cv-03189 BLF

feedback signal, forming drive pulses to turn a switch on and off to control current on the primary side of a transformer) to achieve substantially the same result (e.g., providing a regulated supply of electrical energy to the load)."  However, it is apparent that Dr. Madisetti misstates the claimed function in making this argument; the claimed function is regulating the "the output voltage," not regulating "the output" as Dr. Madisetti asserts.  Moreover, Dr. Madisetti's conclusory assertion of equivalence is again not sufficient to create a genuine dispute of fact or overcome the detailed explanations of PI's technical witness, Mr. Saint-Pierre, that LEDs require constant current and that *regulating voltage could not be used to achieve the same result*.  (Ex. 33, Saint-Pierre Dep. Tr., at 189:5-190:14, 191:6-12, 197:11-24, 203:24-204:6, 211:20-212:20.)  *See Finjan I*, 2015 WL 3630000, at *12 (expert's conclusory assertion of equivalents insufficient to avoid summary judgment under the doctrine of equivalents).  Thus, Dr. Madisetti fails to create any genuine disputes of material fact.

In addition, the Court should strike his opinions to the extent they rely upon infringement theories not contained in ON's infringement contentions.  *E.g.*, *Finjan, Inc. v. Blue Coat Systems, Inc.*, 2015 WL 3640694, *2-4 (N.D. Cal. 2015) (Freeman, J.) (hereafter, "*Finjan II*") (granting motion to strike expert report that advanced new infringement *theories* not contained in contentions; the local rules require "[a] chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality"; "[i]f the theory is new, prejudice is 'inherent in the assertion of a new theory after discovery has closed.'").  While Dr. Madisetti's (unsupported) assertions regarding Ohm's Law may qualify as additional "evidence" rather than a new theory, the new *features* accused by Dr. Madisetti—shutting off the circuit in response to overvoltage and working with 70-80 volt LED bulbs—clearly constitute "a new theory or new element of the accused product alleged to practice a particular claim that was not previously identified in the plaintiff's contentions" because these features are not accused or even mentioned in ON's contentions.  (*Finjan II*, 2015 WL 3640694 at *2; Ex. 34 at 10-12; Ex. 35 at 10-13.)

The Court should therefore strike Dr. Madisetti's new theories and grant partial summary judgment that PI's accused products do not infringe the '601 patent.

1      **VII.    MSJ #5: NONINFRINGEMENT OF THE '272 PATENT**

2              The asserted claims of ON's '272 patent (U.S. Patent 7,944,272, attached as Ex. 42)

3      require a "temperature compensation circuit" to insure constant current regardless of temperature.

4      ON's infringement contentions only vaguely allege that PI's accused LYTSwitch-4 products

5      contain such a "temperature compensation circuit": "on information and belief, the temperature

6      compensation circuit is included in the 'Bias Generator' block in the figure below."  (Ex. 43 at 2.)

7      However, the "figure below" in ON's contentions is a block diagram with no apparent relation to

8      PI's accused products.  ON's contentions do not say what it is, and ON produced no such

9      schematics in discovery.  By contrast, PI did produce *actual* schematics for the accused products,

10     which ON's expert says that he has—but he *never cites* them in his claim chart.  (Ex. 44, Madisetti

11     Appendix E, at 1.)[3]

12             The Court should grant summary judgment of noninfringement of the '272 patent for two

13     reasons.  First, ON's "information and belief" regarding the accused products is belied by the

14     actual evidence: PI's technical witnesses have testified that PI's accused LYTSwitch-4 products

15     ████████████████████████████████████████████████████████████████████

16     ████████████████████████████████████.  For example, PI's Vice President of Product

17     Development, Michael Matthews, testified: "████████████████████████████████████

18     ████████████████████████████████████████████████████████████

19     ████████████████████████████████████████████████████████████████████

20     ████████████████████████████████████████████████

21     ████████████████████████████████████████████████████████

22     ████████████████████  (Ex. 45, 3/27/19 Matthews Dep. Tr., at 154:21-155:5; *see also id.* at 153:12-

23     156:14.)  Mr. Saint-Pierre gave similar testimony.  He explained that ████████████████

24     ████████████████████████████████████████████████████████████████████

25

26             [3] ON's failure to cite PI schematics is particularly ironic given that it successfully moved to
       compel PI to cite ON's circuit schematics in great detail in PI's infringement contentions.  (*See*
27     Dkt. No. 176 at 4 ("PI must amend its contentions to include the citations to the specific portions
       of the schematics and/or datasheets for the NCP1240/NCP1240G products that show where each
28     limitation may be found, or it must map relevant portions of the schematics and/or datasheets for
       the NCP1240/NCPl240G products to the already-charted, representative NCP1246 product.").)

1 ███████████████████████████████████████████████████████████

2 ████████████████████████████ (Ex. 33, Saint-Pierre Dep. Tr., at 214:4-16; *see also id.* at

3 208:10-214:16.)

4       ON's expert, Dr. Madisetti, has no response to this testimony.  He does not even mention

5 the fact that PI's products ██████████████████████████████████████████

6 ████████ (*See* Ex. 44, Madisetti Appendix E.)  Instead, he simply repeats the conclusory

7 assertion in ON's infringement contentions that "the temperature compensation circuit is included

8 in the 'Bias Generator' block in the figure below."  (*Id.* at 1-2.)  He never identifies where in that

9 block the alleged temperature compensation circuit is present.  Again, such conclusory expert

10 testimony is insufficient to create a genuine dispute of material fact.  That is the first reason the

11 Court should grant summary judgment.

12       The second reason is that ON's infringement contentions, with their reference to

13 unidentified figures, have no linking evidence to PI's accused products.  Dr. Madisetti attempts to

14 fill this gap by alleging that the figures (which he reuses) are █████████████████████

15 ████████████████████████ (*Id.* at 1.)  However, ON never produced any such

16 Chipworks report or teardown, contrary to its obligation under Rule 26(a)(1)(A)(ii) (ii) to produce

17 all documents that it "may use to support its claims or defenses, unless the use would be solely for

18 impeachment."  Given ON's violation of Rule 26, the Court should strike Dr. Madisetti's reliance

19 on any Chipworks report.  That leaves ON with no evidence linking its allegations to PI's accused

20 product, and is another reason for the Court to grant summary judgment.

21 **VIII.   MSJ #6: NONINFRINGEMENT OF THE '933 PATENT**

22       All asserted claims of the '933 patent (U.S. Patent RE39,933, attached as Ex. 46) require a

23 "memory circuit," yet ON has no proof that one exists in the accused products.  For each accused

24 product, ON's infringement contentions merely state "[o]n information and belief, the stop logic

25 (dark green box) comprises a memory circuit," or "[t]he state circuit includes a memory circuit

26 (shaded in blue)," or "on information and belief, there is a memory circuit within the Fault Filter

27 (green)," or other similarly vague allegations.  (*E.g.*, Ex. 47 at 3; Ex. 48 at 7; Ex. 49 at 8; *see also*

28

1  all Appendix A Charts from ON's Contentions.)  Yet ON has never produced evidence that the

2  stop logic, or anything else in the accused products, is or contains the required memory circuit.

3       To the contrary, PI's technical witnesses have offered unrebutted testimony that the

4  accused products do not contain the required memory circuit.  For example, Mr. Matthews

5  testified that ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████████████████  (Ex. 45, 3/27/19 Matthews Dep. Tr., at 118:1-6; *see also*

8  *id.* at 116:22-118:6, 123:6-128:5, 156:15-157:19, 162:1-20.)  PI's CEO Balu Balakrishnan gave

9  similar testimony.  (Ex. 50, 3/26/19 Balakrishnan Dep. Tr., at 238:14-239:20.)

10      ON's expert Dr. Madisetti does not address or rebut any of this testimony.  Instead, he

11 merely repeats ON's conclusory allegations that "[t]he stop logic (dark green box) includes a

12 memory circuit" or "[t]he state circuit includes a memory circuit (shaded in blue)."  (*E.g.*, Ex. 51,

13 Madisetti Appendix A-1, at 3; Ex. 52, Madisetti Appendix A-2, at 7; *see also* Ex. 53, Madisetti

14 Appendix A-3.)  Once again, this conclusory assertion is insufficient to meet ON's burden of

15 proof on infringement or create a genuine dispute of material fact.[4]  Summary judgment that PI

16 does not infringe the '933 patent is appropriate.

17 **IX.**     **MSJ #7: NONINFRINGEMENT OF THE '624 PATENT**

18      While ON previously accused multiple PI products of infringing its '624 patent (U.S.

19 Patent 6,333,624, attached as Ex. 54), after the Court's claim construction, ON dropped most of its

20 allegations.  Its expert Dr. Madisetti offered an opinion that only one PI product allegedly

21

22

---

23     [4] For a few accused products, Dr. Madisetti occasionally accuses more specific circuitry.  For

24 example, he says "The circuit schematics for the TOPSwitch-JX provide further evidence of this claim limitation. An annotated circuit schematic is provided in Exhibit 2. PIFIV0000021 shows the OV comparator coupled to receive the control signal and the first reference signal, and having

25 an output (XLOV in the schematic). The XLOV signal is coupled to a first input of the memory circuit. The memory circuit includes circuitry at PIFIV0000023 and continuing at PIFIV0000011."

26 (Ex. 53, Madisetti Appendix A-3, at 6.)  The Court should strike such contentions as accusing a "new element of the accused product alleged to practice a particular claim that was not previously

27 identified in the plaintiff's contentions."  *Finjan II*, 2015 WL 3640694 at *2; *compare* Ex. 54 (Appendix A-3), ON '933 patent contentions for the TOPSwitch-JX (not mentioning OV

28 comparator, XLOV signal, or PIF schematics).

20    POWER INTEGRATIONS' MOTION FOR SUMMARY JUDGMENT
AND MOTION TO STRIKE EXPERT OPINIONS
Case Nos. 16-cv-06371-BLF and 17-cv-03189 BLF

1  infringes the '624 patent: PI's LinkSwitch-4 product.  (Ex. 56, Madisetti Infr. Report, at 4;

2  *compare* Ex. 57 (ON's Infringement Contentions) at 8 (previously accusing InnoSwitch-CH,

3  InnoSwitch-SC, InnoSwitch3-CE, InnoSwitch3-CP, InnoSwitch3-EP, LinkSwitch-II, LinkSwitch-

4  3, and LinkZero-LP.)  ON has no evidence at all that any PI product other than LinkSwitch-4

5  allegedly infringes the '624 patent.

6       The Court should also grant summary judgment that the LinkSwitch-4 product does not

7  infringe the '624 patent.  PI's technical witness Mr. Matthews testified that the LinkSwitch-4

8  product is distinct from the asserted claims of the '624 patent because ████████████████

9  ████████████████████████████████████████████████████████████████████

10 ████████████████████████████ (Ex. 44, 3/27/19 Matthews Dep. Tr. at 145:21-

11 146:10; *see also id.* at 136:8-146:10.)  In addition, Mr. Matthews emphasized that additional

12 detailed technical documents showing the internal design of the LinkSwitch-4 confirmed his

13 understanding, but ON never used these documents at his deposition.  *Id*.  ON's expert, Dr.

14 Madisetti, neither acknowledges nor rebuts this testimony.  Nor does Dr. Madisetti address any

15 detailed technical documents referred to by Mr. Matthews.  Instead, he merely makes the

16 conclusory allegation—relying on a datasheet block diagram that shows no such thing—that "the

17 compensation signal is based on the CURRENT SENSE (CS) signal that is representative of the

18 primary side inductor current" and that "[b]ased at least on the compensation signal, the

19 compensation circuit (the "CABLE COMPENSATION" block) generates the variable reference

20 signal." (Ex. 58, Madisetti Appendix H-1, at 30.)[5]  Again, Dr. Madisetti's conclusory allegation is

21 not enough to create a genuine dispute of fact, and summary judgment should be granted.

---

[5] Dr. Madisetti also makes the same fallacious argument with slightly different words for the other asserted claim, claim 6.  In element 6[a], he says ████████████████████████████████████████████████████ (Ex. 58, Madisetti Appendix H-1, at 4.)  Then, in element 6[b], he says ████████████████████████████ (*Id.* at 10.)  He thus repeats the same mistake as he makes for claim 15, without acknowledging or rebutting Mr. Matthews' testimony.

## X.    MSJ #8: NO WILLFUL INFRINGEMENT

ON's willfulness claims in its infringement contentions rely on the single conclusory statement that "[a]t least for the '624 and '709 Patents [U.S. Patents 6,333,624 and 6,429,709], PI had notice of its infringement prior to the filing of this lawsuit." (Ex. 57 at 41-42.)  However, ON has never produced any evidence that this is so.  Therefore, its allegation of willful infringement for these patents cannot stand.  *E.g.*, *Finjan, Inc. v. Cisco Systems Inc.*, 2017 WL 2462423, *5 (N.D. Cal. 2017) (Freeman, J.) (dismissing willfulness claim that was conclusory and lacked any allegation of pre-suit knowledge); *see also Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1932-33 (2016) ("culpability is generally measured against the knowledge of the actor at the time of the challenged conduct").  In addition, ON has not alleged that PI has willfully infringed any other patent in this case.  Summary judgment of no willful infringement is therefore appropriate.

## XI.    CONCLUSION

The Court should grant summary judgment for PI that ON is precluded from challenging the validity of PI's '876 and '079 patents; that ON's '862 and '908 patent are invalid as anticipated by PI's own SMP3 product; that PI does not infringe ON's '601, '272, '933, and '624 patents; and that PI does not willfully infringe any asserted ON patent.

Dated:  May 2, 2019                          FISH & RICHARDSON P.C.


                                             By:  */s/ Michael R. Headley*
                                                  Michael R. Headley

                                             Attorneys for Plaintiff
                                             POWER INTEGRATIONS, INC.

POWER INTEGRATIONS' MOTION FOR SUMMARY JUDGMENT
                                             AND MOTION TO STRIKE EXPERT OPINIONS
                                             Case Nos. 16-cv-06371-BLF and 17-cv-03189 BLF