**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| POWER INTEGRATIONS, INC., | Case No. 16-cv-06371-BLF |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART, DENYING IN PART, AND FINDING MOOT IN PART ON'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PI'S MOTION FOR SUMMARY JUDGMENT** |
| ON SEMICONDUCTOR CORPORATION, et al., | |
| Defendants. | [Re: ECF 221, 224] |

This case is just one of many in a long line of disputes between Power Integrations, Inc. ("PI") on the one hand and ON Semiconductor Corporation and Semiconductor Components Industries, LLC (collectively, "ON") (and their subsidiaries) on the other. In this consolidated action, each party sues the other for infringement of various patents. PI sues ON for infringement of seven patents: U.S. Patent Nos. 6,212,079 ("the '079 Patent"); 8,115,457 ("the '457 Patent"); 7,239,119 ("the '119 Patent"); 7,538,533 ("the '533 Patent"); 6,297,623 ("the '623 Patent"); 6,414,471 ("the '471 Patent"); and 6,249,876 ("the '876 Patent") (collectively, "PI's Asserted Patents"). *See* PI Compl., ECF 1; PI Ans., ECF 100. ON sues PI for infringement of eight patents: U.S. Patent Nos. 6,333,624 ("the '624 Patent"); 6,429,709 ("the '709 Patent"); RE39,933 ("the '933 Patent"); RE41,908 ("the '908 Patent"); RE45,862 ("the '862 Patent"); 6,597,221 ("the '221 Patent"); 7,944,272 ("the '272 Patent"); and 7,447,601 ("the '601 Patent") (collectively, "ON's Asserted Patents"). ON Third Am. Compl., ECF 94. Each party also asserts declaratory judgment claims, counterclaims, or affirmative defenses of invalidity and non-infringement as to the other parties' asserted patents. PI Ans.; ON Third Am. Compl.; ON Second Am. Ans., ECF 96.

Presently before the Court are the parties' motions for summary judgment. ON Mot., ECF 221; PI Mot., ECF 224. Each party seeks to summarily adjudicate several distinct issues in the case. The Court held a hearing on the motions on June 6, 2019. For the reasons set forth below, ON's motion is GRANTED IN PART, DENIED IN PART, AND FOUND MOOT IN PART and PI's motion is GRANTED IN PART AND DENIED IN PART.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact," *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Once the moving party has satisfied this initial burden, the non-moving party must then "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Schneider v. TRW, Inc.*, 938 F.3d 986, 991 (9th Cir. 1990). It is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279 (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Moreover, the court makes no credibility determinations and does not weigh the evidence. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 254; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## II. DISCUSSION

The Court first addresses ON's motion and then turns to PI's motion. The Court provides the facts relevant to each issue in the respective issue's subsection.

### A. ON's Motion for Summary Judgment (ECF 221)

ON moves for summary judgment of six issues: (1) whether the asserted claims of PI's '623 Patent, '533 Patent, and '457 Patent are invalid for indefiniteness; (2) whether PI's damages period is limited to the time of filing of its claims for each asserted patent because PI failed to provide ON with pre-suit notice of its claims of infringement; (3) whether in *inter partes* review ("IPR") PI disclaimed the claim scope of its '079 Patent, such that ON's accused products do not infringe the asserted claims; (4) whether ON's accused products do not infringe the '079 Patent because they do not meet the "fixed switching frequency" requirement of the asserted claims; (5) whether the asserted claims of PI's '471 Patent are invalid as anticipated by U.S. Patent No. 4,413,224 ("the '224 Patent") to Krupka; and (6) whether PI can prove infringement of claim 1 of PI's '876 Patent even though its infringement contentions and expert reports do not address the version of the claim that was amended in reexamination during the pendency of this action. *See* ON Mot. at 1–2.

The Court addresses each issue in turn.

### 1. Invalidity of PI's '623, '533, and '457 Patents for Indefiniteness

ON first asks the Court to enter summary judgment on the asserted claims of the '623 Patent, the '533 Patent, and the '457 Patent because the Court held the asserted claims indefinite in its claim construction order. ON Mot. at 2 (citing ECF 196 at 19–21, 27–31, and 33–36; ECF 198). PI does not oppose this request. PI Opp. at 1, ECF 238.

"A lack of definiteness renders invalid 'the patent or any claim in suit.'" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 902 (2014) (quoting 35 U.S.C. § 282, ¶ 2(3) (2006 ed.)). Because the Court has held that all asserted claims of these three patents are indefinite, the Court holds that the asserted claims are invalid and thus GRANTS ON's motion for summary judgment on this issue.

### 2. PI's Damages Period and Pre-Suit Notice

ON asks the Court to hold that the damages periods for infringement by ON of PI's patents (the '079, '876, '471, and '119 Patents) began when PI first filed claims for infringement of each asserted patent. ON argues that 35 U.S.C. § 287 dictates this result because PI neither marked its products with the asserted patent numbers nor otherwise notified ON of any alleged infringement prior to PI's filing claims on each patent.

Section 287 requires patentees and those selling patented products in the United States to mark their products in specific ways in order to provide notice that the products are patented. If a patentee or seller does not comply with this requirement, Section 287(a) limits his or her rights in certain ways:

> In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a). Under this subsection, "notice" means actual notice, which "requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994).

PI does not dispute that it did not mark its products. *See* PI Opp. at 1–4; ON Mot., Ex. B at 241, ECF 221-3 (testimony by PI's president and CEO stating that he does not believe PI marked its products). And PI does not present any evidence with respect to any other notice of ON's infringement of the '119 Patent. As such ON's motion is GRANTED with respect to the notice date of the '119 Patent, which is the first date on which PI filed a claim for infringement of this patent against ON.[1]

However, PI argues that the damages periods for the '079, '876, and '471 Patents are not limited to the date of filing of the relevant claims. PI's arguments as to the '079 and '876 Patents differ from its arguments as to the '471 Patent. The Court discusses each set of arguments in turn.

---

[1] Neither ON nor PI provides the relevant date to the Court, but the Court believes this date is November 1, 2016, when PI filed its Complaint in this case. *See* ON Mot., Ex. C at 10, ECF 221-4 (PI's October 24, 2018 interrogatory responses).

*a. '079 and '876 Patents*

PI argues that the damages periods for the '079 and '876 Patents began on June 16, 2014 (before PI's filing of the relevant claims). On June 16, 2014, PI's CEO Balu Balakrishnan sent an email to ON's CEO Keith Jackson which stated in relevant part that PI's "initial review of [ON's product] NCP1246 data sheet indicates that patent numbers ending in 079, 457 and[] 851 and/or 876 are infringed." ON Mot., Ex. D, ECF 221-5; *see* PI. Opp. at 1–4.

ON makes two arguments as to why the June 2014 email, as well as other similar communications in 2014, do not constitute actual notice under Section 287: (1) PI's own employees "affirmatively disclaimed" that the communications constitute actual notice; and (2) the communications are settlement communications protected by Federal Rule of Evidence 408 and thus "not usable for any purpose in this litigation." ON Mot. at 3. Neither argument is persuasive.

First, genuine disputes of material fact exist as to ON's affirmative disclaimer argument. ON presents evidence that PI's 30(b)(6) witness Mr. Clifford Walker testified in his deposition that it is PI's position that the communications in 2014 do not constitute actual notice because at the time of the communications and on the day of his deposition (on April 16, 2019) he intended that the communications would be protected settlement communications under Rule 408. *See* ON Mot. at 4 (citing Ex. G at 263:12–17; 267:24–268:10, ECF 221-8). But PI cites additional testimony from Mr. Walker in that same deposition which shows that his intent is not so definite. *See* PI Opp. at 2–3. When Mr. Walker was asked whether it was PI's position that the 2014 communications were not actual notice, he responded saying, "[w]ell, that was our original intent. I'm not sure exactly how it has developed, but that was our intent that it not [sic] to be notice but maybe it actually was depending on if someone says, [w]ell, those were not settlement discussions and, therefore, not protected and, therefore, obviously the communications were notice." ON Mot., Ex. G at 262:24–263:6. He also clarified that his "answer is qualified to the extent that ON agrees that these were settlement discussions," saying, "To me, it goes both ways. If we say it's settlement, then I agree that neither party received notice. If we decide, well, it actually wasn't settlement discussions, protected discussions despite the parties' intent and there was a

1  misunderstanding, then maybe they were notices. So I don't know the answer." *Id.* at 267:11–13,

2  17–23.

3        ON argues that this contradictory evidence is not material because Mr. Walker's disclaimer

4  hinges on ON's willingness to agree that the discussions were settlement communications, and

5  ON, in its motion, *does* agree that they were settlement communications, thus triggering Mr.

6  Walker's disclaimer. *See* ON Reply at 2, 7, ECF 245. But again PI presents evidence that puts in

7  dispute whether Mr. Walker would disclaim that the communications serve as notice in this case.

8  Specifically, PI notes that on several occasions throughout this lawsuit ON itself has used the 2014

9  communications for its own purposes, such as when it attached the June 2014 email to its Third

10 Amended Complaint as a basis for declaratory judgment jurisdiction (ECF 94 ¶ 24; ECF 94-5) and

11 when it cited the 2014 communications in its infringement contentions as a basis for alleging

12 indirect and willful infringement of its own patents (*see, e.g.*, ECF 224-58 at 11). *See* PI Opp. at

13 1–2. Given ON's use of the communications in this suit and the reliance of Mr. Walker's alleged

14 disclaimer on ON's actions with respect to the communications, a reasonable jury could conclude

15 that PI did not, in light of ON's actions, affirmatively disclaim or waive its right to argue that the

16 communications constitute actual notice. Thus, genuine disputes of material fact bar summary

17 judgment based on ON's first argument for affirmative disclaimer.

18       As to ON's second argument, as a matter of law Federal Rule of Evidence 408 does not bar

19 PI's use of the 2014 communications, including the June 2014 email, in this litigation. Rule 408

20 provides that settlement communications are not admissible as evidence "either to prove or

21 disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement

22 or a contradiction." F.R.E. 408(a). Such evidence is admissible, however, "for another purpose,

23 such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an

24 effort to obstruct a criminal investigation or prosecution." F.R.E. 408(b). As PI notes (PI Opp. at

25 3), the Advisory Committee Notes to the 2006 Amendments to Rule 408 make abundantly clear

26 that such evidence is admissible to prove notice, stating that "[t]he amendment does not affect the

27 case law providing that Rule 408 is inapplicable when evidence of the compromise is offered to

28 prove notice."

6

The case law confirms that Rule 408 does not bar the introduction of such evidence for notice purposes. *See Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1055 (9th Cir. 2015) (recognizing that Rule 408 does not bar evidence submitted to prove "notice or knowledge" and holding admission of previous consent decree with FTC was allowed under Rule 408 to "show [the defendant] was *aware* the FTC (and [plaintiff]) found its conduct questionable enough to merit investigation"); *United States v. Austin*, 54 F.3d 394 (7th Cir. 1995) (upholding admission of evidence relating to FTC settlement because it was used in part to "show[] that [the defendant] was on notice when he subsequently sold prints that those prints were forgeries"); *Samsung Electronics Co., Ltd. v. Quanta Computer, Inc.*, No. 00-CV-04524, 2006 WL 2850028, at *5 (N.D. Cal. Oct. 4, 2006) (holding Rule 408 would not bar admission of pre-litigation settlement negotiations introduced "to demonstrate [the defendant] had actual notice of the '273 patent and [the plaintiff]'s assertion of infringement"); *cf. Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182, 185 (7th Cir. 1982) ("In this case, the 'settlement' evidence was properly presented below to rebut defendants' assertion that they had not been aware of the issues until the suit was filed.").

ON asserts without citation that PI's introduction of this evidence for notice is impermissible under Rule 408 because PI is improperly using the evidence to prove the "amount of a disputed claim." ON. Mot. at 3–4. ON argues that because the evidence would increase the length of the damages period, it necessarily would increase the potential damages, and in turn the amount of the claim. Not only does this unsupported argument directly contradict the Advisory Committee Notes and the case law above, but also it is not convincing in its own right. The same argument could be made with respect to evidence introduced to "negat[e] a contention of undue delay," which is explicitly excepted from Rule 408. A contention of undue delay could limit a damages period or indeed preclude a claim entirely (such as in the case of, say, laches), but the Rule makes clear that proving undue delay is not akin to proving the amount of a disputed claim. The Court sees no meaningful distinction on this front between proving undue delay and proving notice. Thus, the Court concludes as a matter of law that Rule 408 does not bar PI's use of the 2014 communications as notice here.

Having determined that the June 2014 email is not excluded, the Court concludes that ON has failed to meet its initial burden to demonstrate that PI has no evidence of actual notice of ON's alleged infringement of the '079 and '876 Patents prior to filing the relevant claims.

However, ON also argues that even if the June 2014 emails are not excluded, PI has no evidence that it provided actual notice on any accused product other than NCP1246, the sole product discussed in the June 2014 email. *See* ON Mot. at 6–7 (citing *Amsted*, 24 F.3d 186; *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1347 (Fed. Cir. 2001)). But as PI notes, the Federal Circuit has held that "when the threshold specificity [for actual notice] is met, the ensuing discovery of other models and related products may bring those products within the scope of the notice." *Funai Elec. Co., Ltd. v. Daewoo Electronics Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010); *accord K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1379 (Fed. Cir. 2012). ON has not pointed to any evidence or the absence thereof to prove that ON's accused products are not sufficiently similar to NCP1246 to be covered by the notice. *See* ON Mot. at 6–7. Thus, on this issue as well, ON fails to meet its burden on summary judgment of pointing to evidence or the absence thereof that demonstrates that there is no genuine dispute as to any material fact entitling it to judgment as a matter of law. *See T.W. Elec. Serv. Inc.*, 809 F.2d at 630.

For these reasons, ON's motion is DENIED as to the '079 and '876 Patents.

> ### b. '471 Patent

As to the '471 Patent, PI argues that Section 287 does not apply because PI asserts only method claims of the '471 Patent in this suit, and Section 287 does not apply to method claims. *See* PI Opp. at 4. ON does not refute that PI asserts only method claims here or that Section 287 does not cover method claims. Rightly so because "[t]he law is clear that the notice provisions of § 287 do not apply where the patent is directed to a process or method" or when the patentee "assert[s] only the method claims of a patent." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009) (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983)).

Despite the inapplicability of Section 287, ON argues in reply that PI is barred from asserting an earlier damages period for the '471 Patent because "PI cannot show that ON knew of

United States District Court
Northern District of California

the '471 Patent and expressly intended that its customers use the patent in an infringing way," which in turn means that PI cannot prove that ON is liable for induced infringement. ON Reply at 4–5. This is a different theory for limiting the damages period than ON asserted in its opening brief. In its opening brief, ON argued that PI cannot prove that it provided ON "actual notice" under Section 287. *See* ON Mot. at 2–3, 7–8. As ON recognizes, "subjective knowledge of an accused infringer is irrelevant to the determination of whether actual notice has been provided." *Id.* at 8 (citing *Amsted*, 24 F.3d at 187). By contrast, in its reply brief, ON argues that PI cannot prove that "ON knew of the '471 Patent and expressly intended that its customers use the patent in an infringing way"—that is, that ON, as the accused infringer, had *subjective* knowledge of the patent. *See* ON Reply at 5 (citing *Commil USA, LLC v. Cisco Sys., Inc.*, 125 S. Ct. 1920, 1926–28 (2015)). Thus, ON argued in its opening brief that ON's subjective knowledge was irrelevant but argued in its reply brief that PI is required to and cannot prove ON's subjective knowledge.

Because ON expressly disclaimed the relevancy of its subjective knowledge in its opening brief, PI did not have a meaningful opportunity to present evidence to prove ON's subjective knowledge. Because ON did not raise this argument in its opening brief, it has waived the argument. *See Pension Plan for Pension Tr. Fund for Operating Engineers v. ACME Concrete*, No. C 12-04410 JSW, 2013 WL 12149703, at *2 n.1 (N.D. Cal. Jan. 11, 2013); *Cf. Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1225 n.4 (9th Cir. 2013).

As such, ON has not demonstrated that summary judgment is appropriate on this issue, and its motion is DENIED as to the '471 Patent's damages period.

\* \* \*

Based on the foregoing, the Court GRANTS ON's motion on this issue as to the '119 Patent and DENIES it as to the '079, '876, and '471 Patents.

### 3. Non-Infringement of PI's '079 Patent Based on PI's Disclaimer of Claim Scope During IPR

ON next argues that PI disclaimed the claim scope of the asserted claims of the '079 Patent during IPR of the '079 Patent, such that the asserted claims do not cover ON's products. ON Mot. at 8–14. ON argues only prosecution disclaimer here; it "does not argue that PI is bound by

9

judicial estoppel or prosecution history estoppel." ON Reply at 5. The Court first discusses the relevant facts, then prosecution-disclaimer law, and then the parties' arguments here.

### a. Relevant Facts

In 2016, ON filed an IPR petition challenging the patentability of certain claims of PI's '079 Patent, including all of the asserted claims in this action. *See ON Semiconductor Corp. v. Power Integrations Inc.*, Case No. IPR2016-00809. The PTAB instituted the IPR ("'079 IPR") and issued a Final Written Decision finding all of the asserted claims here unpatentable. *See ON Mot., Ex. H ("'079 FWD") at 71, ECF 221-9. The Federal Circuit vacated the Final Written Decision as time-barred and remanded with instructions to dismiss the IPR. *See Power Integrations Inc. v. Semiconductor Components Industries, LLC*, No. 18-1607, ECF 88 at 2 (Fed. Cir. June 13, 2019) ("'079 Appeal"), ECF 268-1.

One of the primary references at issue in the '079 IPR was Japanese Unexamined Patent Application Publication JP H10-323028 by Seiji Oda, et al. ("Oda") (Translation at ON Mot., Ex. J ("Oda"), ECF 221-11). *See* '079 FWD at 2. The Court need not recite the technical details of Oda and the '079 Patent to resolve this issue. In oversimplified and relevant part, "Oda discloses a switched power supply converter switching structure that controls pulse width and pulse frequency." *See* '079 FWD at 38 (citing Oda). Oda's disclosed circuit uses a switch to regulate output voltage. The length of time that the switch is on is called the "on-time" of the switch. In Oda, the on-time of the switch is a "'function of' two variables": one tied to the output voltage (*i.e.*, a feedback signal) and one tied to the input voltage. *Id.* at 41 (citing Oda).

During the course of the IPR, PI sought to distinguish Oda from the '079 claims. Specifically, it argued that the '079 Patent "describes and claims using *only* a feedback signal responsive to power supply output to vary on-time. The '079 Patent does not disclose or suggest also using a signal from the power supply input." ON Mot., Ex. L at 50, ECF 221-13 (citations omitted). That is, PI argued that the '079 claims were valid because Oda disclosed using *both* a feedback signal and a signal based on input voltage whereas the asserted claims disclosed using only a feedback signal. PI's argument was based on its interpretation of the term "correspond" in asserted claims 31 and 38 and the term "function of" in claims 34 and 42. *See id.* at 48–52 (citing

10

'079 Patent).

The PTAB ultimately rejected PI's arguments, construing the claims to be broader than PI had argued and declining to dismiss the petition based on Oda's requirement that the switch function in part based on the input voltage. '079 FWD at 23–27, 59–60.

### b. Prosecution Disclaimer Law

Prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Under this doctrine, "when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Put another way, "when a patentee, on the rejection of his application, inserts in his specification, in consequence, limitations and restrictions for the purpose of obtaining his patent, he cannot after he has obtained it, claim that it shall be construed as it would have been construed if such limitations and restrictions were not contained in it." *Roemer v. Peddie*, 132 U.S. 313, 317; *accord Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017); *see also Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220–21 (1940) ("It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent."). Such disclaimer can occur through amendment or argument. *Id.* at 1359. And though the doctrine originates in the context of pre-issuance prosecution, the Federal Circuit has applied the doctrine to post-issuance proceedings before the Patent and Trademark Office, including IPR proceedings. *Id.*

The Federal Circuit has described prosecution disclaimer as "a fundamental precept in [] claim construction jurisprudence." *Aylus*, 856 F.3d at 1359. The doctrine "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution" and is "rooted in the understanding that [c]ompetitors are entitled to rely on those representations when determining a course of lawful conduct." *Id.* (alteration in original)

11

(citations omitted). Ultimately, the doctrine "ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" *Id.* at 1360 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

### c. Analysis

ON asks the Court to hold that through prosecution disclaimer PI waived its right to argue that the '079 asserted claims cover products that depend on both a feedback signal and an input voltage signal, and ON's products indisputably depend on both signal types. ON Mot. at 8–14.

The Court holds that PI is not barred by prosecution disclaimer from arguing that the asserted claims cover more than a single signal, and thus from arguing that ON's products infringe the claims.

Prosecution disclaimer does not apply here for two independent reasons. First, and most importantly, ON failed to make this argument during claim construction and does not provide evidence to support such a construction here. As the case law makes clear, ON's argument is appropriately classified as a claim construction argument. *See, e.g.*, *Omega Eng'g*, 334 F.3d at 1323 (stating rule that prosecution disclaimer "preclud[es] patentees from recapturing through *claim interpretation* specific meanings disclaimed during prosecution" (emphasis added)); *Schriber-Schroth*, 311 U.S. at 220–21 (1940) ("It is a rule of *patent construction* consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected . . . ."). Indeed, ON's argument recognizes that PI's alleged disclaimer stems from PI's claim construction arguments to the PTAB. That is, ON, through its motion, wants to bind PI to the claim construction PI proposed to the PTAB. *See* ON Mot. 10–11. But ON never argued for this limited construction during claim construction in this action. At that time, ON argued that the relevant claim terms ("correspond" and "function of") should be given their "[p]lain and ordinary meaning; no construction necessary." ECF 97-1 at 7. ON has never offered an alternative construction of these claims. Nor does it seek in its motion to prove that the plain and ordinary meanings of the terms should incorporate the disclaimer it seeks to impose on PI here. Indeed, it rejects PI's construction as an incorrect construction of the terms. *See* ON Mot. at 12. Thus, ON seeks a construction of the terms here that differs from its previously proposed

United States District Court
Northern District of California

construction.

Moreover, based on its proposed "plain and ordinary meaning" construction, the Court is concerned that ON could attempt to argue at trial that the '079 claims are invalid as obvious over Oda—in line with the PTAB ruling. At the same time, ON could attempt to bar PI from using that broader construction for its infringement arguments. That is, if the Court were to accept ON's disclaimer argument here, the scope of the claims would differ between PI's infringement arguments and ON's invalidity arguments. The law does not allow such a result. As ON is well aware, only a single interpretation of the claims is allowed for both infringement and invalidity purposes. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("[T]he claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses."). This potential result further counsels against finding disclaimer here. Thus, ON's failure to raise this construction at claim construction or to properly seek leave of Court for further claim construction under the Patent Local Rules now bars summary judgment on this issue.

Second, as an independent, alternative ground for denial, prosecution disclaimer does not apply to this somewhat unique procedural posture, where (1) the PTAB expressly rejected PI's proposed constructions, and (2) the Federal Circuit vacated the PTAB's final written decision on procedural, time-bar grounds, with the IPR to be dismissed. As to the former, ON does not cite (nor could the Court find) a single case in which prosecution disclaimer bound a patentee to its previous arguments where the examiner or PTAB *rejected* those arguments. This dearth of case law is likely due in part to the fact that a rejection of the patentee's arguments generally means either the patent is never issued, or the patent is found invalid in the post-issuance proceeding, as happened here. But putting the potential rarity of this posture to the side, applying prosecution disclaimer where the patentee's arguments are expressly *rejected* by an adjudicative body does not comport with the purposes of the doctrine to provide "public notice" to potential infringers and allowing them "to rely on those representations when determining a course of lawful conduct." *Aylus*, 856 F.3d at 1359 (alteration in original) (citations omitted). Once the examiner or PTAB has expressly rejected a patentee's construction, a potential infringer could not then reasonably

rely on the patentee's construction. The examiner or PTAB has already said that the patentee's construction is incorrect and that the proper construction is broader. It would be inequitable to the patentee to apply prosecution disclaimer in such a scenario because the potential infringer could use disclaimer to argue for the narrower construction for infringement purposes even though the agency has *already rejected* that construction.

Though the Court is not aware of any higher court explicitly holding that prosecution disclaimer does not apply in such a scenario, this result is implicitly baked into the test for prosecution disclaimer. This test (and the rationales underlying it) is meant to hold patentees to the arguments they make to secure *allowed* claims, not rejected claims. Almost 80 years ago in *Schriber-Schroth Co.*, the Supreme Court stated the foundational rule of prosecution disclaimer: "It is a rule of patent construction consistently observed that *a claim in a patent as allowed* must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." 311 U.S. at 220–21 (emphasis added). In that case, claims and amendments that included a flexible webs element had been rejected in interference and were subsequently withdrawn by the patentee in favor of the final claims, which did not include that element. *Id.* at 220. The Supreme Court decided "whether in view of the amendments and their withdrawal the patent c[ould] rightly be construed as including the flexible webs in the claim allowed." *Id.* The answer was no. "The patentee may not . . . give to *an allowed* claim a scope which it might have had without the amendments, the cancellation of which amount to a disclaimer." *Id.* at 221 (emphasis added). "[I]f patentees were thus permitted to revive cancelled or rejected claims and restore them to their patents," it would have "injurious consequences to the public and to inventors and patent applicants." *Id.* Ultimately, the Supreme Court held that "the patentee, having acquiesced in their rejection, is no longer free to gain the supposed advantage of the rejected claims by a construction of *the allowed claims* as equivalent to them." *Id.* at 221–22 (emphasis added); *accord Roemer*, 132 U.S. at 317. Thus, the Supreme Court made clear that prosecution disclaimer operates on *allowed* claims, not expressly rejected ones.

ON's argument to the contrary is misguided. ON argues that "[p]rosecution disclaimer

14

applies, even if the Patent Office is not persuaded by the argument" made by the patentee.  ON Mot. at 13; ON Reply at 5 (citing *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1374 (Fed. Cir. 2005); *Omega Eng'g*, 334 F.3d at 1327; *Spring Windows Fashions v. Novo Indus., L.P.*, 323 F.3d 989, 994–95 (Fed. Cir. 2003); *ZitoVault, LLC v. Int'l Bus. Mach. Corp.*, No. 3:16-CV-962, 2018 WL 1964012, at *1 (N.D. Tex. Mar. 23, 2018)).  ON cites cases for the rule of law that "[a]n applicant's argument made during prosecution may lead to a disavowal of claim scope even if the Examiner did not rely on the argument."  *Seachange*, 413 F.3d at 1374; *see also Spring Windows*, 323 F.3d at 994–95 ("Because an examiner has the duty to police claim language by giving it the broadest reasonable interpretation, it is not surprising that an examiner would not be satisfied with the applicant's insistence that particular claim language distinguishes a prior art reference, but that a court would later hold the patentee to the distinction he pressed during prosecution." (citation omitted)).

ON's cited cases are beside the point here.  Though these cases can be read to hold that a losing argument made to an adjudicative body binds the patent holder to the position argued, none of those cases so held in the context of an argument that the PTO *expressly rejected*.  In each of those cases, the patent examiner simply ignored or did not rely on one or more of the patentee's arguments.  Ultimately, though, the patent examiner in each case *allowed* the argued claim scope, relying on some alternative argument made by the patentee.  In none of those cases did the patent examiner *expressly reject* the patentee's argument and in turn *disallow* the argued claim scope. This distinction makes all the difference because the public notice function served by prosecution disclaimer functions much differently where the claim scope is rejected.  When the scope is rejected, the adjudicative body's final decision rejecting the claim scope provides notice to the public that the claim scope is different than what the patentee argued—*i.e.*, that the patentee's claim scope is wrong.  It would be an odd outcome indeed if the patentee was required to maintain an argument in a later adjudication when everyone, including the alleged infringer, is on notice that the argument is incorrect.

Because PI's argued claim scope was expressly rejected by the PTAB, this Court holds that prosecution disclaimer does not apply here.

But even if the PTAB's rejection of PI's arguments were sufficient to apply prosecution disclaimer to PI, this case is unique for the additional reason that the PTAB's decision was vacated and remanded for dismissal because the IPR was time-barred and never should have occurred. It is not clear that the record in a procedurally improper, vacated IPR can or should bind the patentee in future litigation. *Cf. Camreta v. Greene*, 131 S.Ct. 2020, 2025 (2011) ("Vacatur then rightly strips the decision below of its binding effect, and clears the path for future relitigation." (citations omitted)).

Because ON has not proven as a matter of law that PI is barred by prosecution disclaimer from arguing that the '079 claims cover products that use more than one signal to vary on-time, and because ON argues that its products use more than one signal to vary on-time, ON's motion on this issue is DENIED.

### 4. Non-Infringement of PI's '079 Patent Due to Failure to Satisfy the "Fixed Switching Frequency" Claim Requirement

ON next argues that PI cannot prove that ON's accused products infringe the asserted claims of the '079 Patent because they do not practice the "fixed switching frequency" requirement of the asserted claims. *See* ON Mot. at 15–17 (citing Ex. K at claim 31, ECF 221-12); *see also* Ex. K at claims 34, 38, and 42.

#### a. Relevant Facts

Each of the asserted claims of the '079 Patent contains the limitation of "a control circuit . . . coupled to switch the power switch at a *fixed switching frequency* for a first range of feedback signal values." *See* ON Mot., Ex. K at claims 31, 34, 38, and 42 (emphasis added). The '079 Patent was the subject of another civil action in this district, in which PI sued Fairchild Semiconductor, which is now ON's wholly owned subsidiary. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., et al.*, No. 3-09-CV-05235-MMC (N.D. Cal.). In 2011, when the case was still in front of Judge Ware, Judge Ware construed the "fixed switching frequency" term to mean "a non-varying number of switching cycles per second." ON Mot., Ex O at 10. In so doing, Judge Ware noted that "fixed" means "not subject to change or fluctuation" and "non-varying." *Id.* PI had argued that Judge Ware should construe the term to mean "the target

1    switching frequency is intended to be substantially fixed; but does not preclude the presence of a

2    frequency jittering circuit." Mot., Ex. N at 18. Judge Ware did not incorporate PI's proposed

3    language regarding frequency jittering circuits.

4         The jury in that case went on to hold that Fairchild's "frequency-hopping" or "jitter"

5    products literally infringed the '079 Patent under Judge Ware's construction, and Judge Chesney

6    (the newly assigned judge) denied Fairchild's motion for judgment as a matter of law. The

7    Federal Circuit affirmed on liability. *See Power Integrations, Inc. v. Fairchild Semiconductor*

8    *Int'l, Inc.*, 904 F.3d 965 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 1265 (2019). On appeal,

9    Fairchild argued, in relevant part, that Judge Ware had erred in construing the term to include the

10   "per second" limitation, "rather than looking to overall variation." *Id.* at 973. The Federal Circuit

11   held that Fairchild had waived that argument and thus analyzed only "whether substantial

12   evidence supported the jury verdict under [Judge Ware's] construction." *Id.* The Federal Circuit

13   upheld the verdict because "a reasonable jury could have concluded that the accused products

14   operate with a 'fixed switching frequency'" based on Fairchild's expert Dr. Kelley's testimony

15   that "the accused products operate with a non-varying number of cycles per second for a range of

16   operation." *Id.* at 974.

17         *b.  Analysis*

18        ON first argues that the Court should adopt Judge Ware's claim construction in this case,

19   and then argues that none of its accused products infringe the asserted claims under that

20   construction, such that summary judgment of non-infringement is warranted.

21        As to claim construction, PI argues that ON has waived its right to assert Judge Ware's

22   construction here because ON did not propose Judge Ware's construction during the claim

23   construction phase of this action. *See* PI Opp. at 9 (citing ECF 97-1 at 6). While the Court found

24   that argument compelling above, it has little sway here where ON now proposes the construction

25   that *PI proposed* in its initial joint claims construction statement.[2] PI proposed Judge Ware's

26

27   _____

28   [2] The parties ultimately decided not to submit this term to the Court at the *Markman* hearing when
     they reduced the contested claims to ten in compliance with the Northern District of California's
     Patent Local Rules.

construction at claim construction. *See* ECF 97-1 at 6. When parties propose a claim construction at summary judgment that the Court has not previously construed, this Court adopts the non-moving party's construction for purposes of the motion. *See, e.g.*, *Finisar Corp. v. Nistica, Inc.*, No. 5:13-CV-03345-BLF, ECF 551-3 at 8 (Apr. 4, 2016). Here, the moving party's construction *is* the non-moving party's construction, and PI does not propose an alternative construction. Moreover, PI did not rebut ON's contention that PI is collaterally estopped from opposing this construction.[3] *See generally* PI Opp. As such, the Court will adopt Judge Ware's construction for the purposes of resolving this motion: "fixed switching frequency" means "a non-varying number of switching cycles per second."

As to infringement, ON has not shown that there is no genuine dispute as to any material fact entitling it to judgment as a matter of law that its accused products do not infringe. The only evidence that ON presents on the issue is PI's expert Dr. Kelley's infringement report with respect to the '876 Patent. *See* ON Mot. at 16–17. The products accused of infringing the '079 Patent are also accused of infringing the '876 Patent. *See* ON Mot., Ex. Q. In his report, Dr. Kelley states that the representative accused products have a "time-varying switching frequency." *See* ON Mot., Corrected Ex. W, ECF 283-1. ON states, without citation that "time-varying . . . is the opposite of a switching frequency that is 'fixed', 'not subject to change or fluctuation,' or 'non-varying,'" such that the accused products cannot infringe. But Judge Ware's construction includes the qualifier of "a non-varying number of switching cycles *per second*." ON Mot., Ex O at 10 (emphasis added). ON has not pointed to any evidence (or the absence thereof) to support the conclusion that "time-varying" is diametrically opposed to "non-varying . . . per second." Indeed, the "time-variation" of the switching frequency in the accused products may occur within the one second limitation. Put another way, on the evidence before the Court, Dr. Kelley's opinion regarding the accused products' infringement of the '876 Patent cannot alone be used to demonstrate, as a matter of law, that PI has no evidence that the products have a "fixed" frequency

---

[3] The Court does not address PI's argument that ON is "precluded from arguing that jitter is inconsistent with 'fixed switching frequency'" because PI is not the moving party and because the Court rejects PI's privity argument in Section III.B.1.

under Judge Ware's construction of the '079 Patent. Thus, ON's motion fails.

ON's other arguments do not cure this failure. In its motion, ON implies that PI's choice to accuse the same set of products of infringing both the '876 and '079 Patents somehow demonstrates that ON's accused products do not infringe the '079 Patent. ON Mot. at 16. This is so, ON argues, because the '876 Patent's asserted claims "all explicitly require the switching frequency to be varied." *See id.* (reciting claims). According to ON, because its products satisfy this limitation of the '876 Patent through "deliberate variation of the switching frequency," they necessarily do not infringe the '079 Patent claims. *Id.* (emphasis omitted). This argument misses the mark for three reasons. First, ON points to no evidence (or the absence thereof) demonstrating that its accused products practice the limitation of the '876 Patent, just as it has failed to present evidence that they do not practice the limitation of the '079 Patent. Second, ON has not presented any evidence, for example expert testimony or cites to the intrinsic record, to demonstrate that the two Patents' asserted claims are diametrically opposed. And third, PI is permitted to make arguments in the alternative to the jury, even if those positions conflict. If PI finds it difficult to present infringement theories under both patents on the same products, that is PI's problem. It does not mean ON is entitled to summary judgment.

In its reply, ON charts a different, somewhat confusing course. ON appears to want to relitigate Judge Ware's claim construction, arguing that Judge Ware did not intend for the "per second" portion of the term to modify the "fixed" portion, and that by "fixed" he meant for the term not to encapsulate products with a varying frequency. ON Reply at 9. In essence, ON asks the Court to construe Judge Ware's construction by reading out the weight of the "per second" language. But Judge Ware's construction says what it says. The Court cannot read out the "per second" language based on a vain attempt to interpret Judge Ware to mean one thing when he said another. ON provides the Court no evidence other than Judge Ware's words themselves from which the Court could divine ON's preferred reading. Judge Chesney already interpreted Judge Ware to mean what he said, and this Court chooses to follow Judge Chesney's considered lead.[4]

---

[4] The Court does not mean to imply that ON is somehow collaterally estopped by Judge Chesney's interpretation of Judge Ware's construction. The Court simply agrees with Judge Chesney.

The Court declines to agree with ON that Judge Chesney was somehow mistaken when she allowed PI to present expert testimony to the jury from which they could (and did) find that the claim covered jittering products. *See* ON Reply at 11. Based on a straightforward reading of the claim as construed, one reasonable jury has already interpreted this construction to not exclude "frequency-hopping" or "jittering" products. *See* 904 F.3d at 973–74.[5]

Thus, because ON has not demonstrated that the undisputed facts entitle it to judgment as a matter of law that its accused products do not infringe the asserted claims of the '079 Patent under Judge Ware's construction of "fixed switching frequency," ON's motion is DENIED.

### 5. Invalidity of PI's '471 Patent Due to Anticipation by the '224 Patent to Krupka

ON moves for summary judgment of invalidity of the asserted claims (19 and 20) of PI's '471 Patent because the claims are anticipated by U.S. Patent No. 4,413,224 to Krupka et al. ("Krupka"). After ON filed its motion, but before it filed its reply, the PTAB issued a Final Written Decision finding, in relevant part, the asserted claims of the '471 Patent unpatentable as obvious over Krupka. *See* ON Reply, Ex. X ("'471 FWD") at 53, ECF 245-2. The Court notes that ON did not argue in the IPR that Krupka anticipates the '471 Patent. Also, ON does not argue that the FWD somehow binds this Court.

The Court need not recount the technical details of each patent to resolve this motion. However, for context, the asserted method claims of the '471 Patent require, in part, receiving a "feedback signal" that can have one of two feedback states, with the feedback states representing a level at the power converter output either above or below some threshold level, respectively. *See* ON Mot., Ex. R ("'471 Patent") at claim 19, ECF 221-19. These feedback states then contribute to the enabling or disabling of the flow of energy through the power converter. *Id.* The key dispute between the parties in front of the PTAB and here is whether the signal in Krupka known as "control signal 2" satisfies the "feedback signal" limitation of the asserted claims. *See* '471 FWD at 44–45; PI Opp. at 11–13 (citing expert testimony refuting that control signal 2 is a

---

[5] The Court does not adopt Judge Ware's construction of "fixed switching frequency" for trial, but rather only considers the nonmoving party's construction for purposes of deciding this motion.

feedback signal).

ON bears the burden of proof on invalidity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). The Court denies ON's motion because ON has not demonstrated that there is no genuine dispute of material fact with respect to whether Krupka describes every limitation of the asserted claims. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 918 F.3d 1368, 1378 (Fed. Cir. 2019) ("Anticipation requires that a single prior art reference disclose each and every limitation of the claimed invention, either expressly or inherently."). Though ON's motion dutifully compares the elements of the '471 asserted claims with the teachings of Krupka, ON does not cite any expert testimony in support of its assertions; ON cites only the two patents. *See* ON Mot. at 17–23. But ON expressly recognizes that the anticipation question here is governed by what a person of ordinary skill in the art ("POSITA") would have understood when reading Krupka. For example, in arguing that Krupka's control signal 2 satisfies the '471 claims' feedback signal element, ON argues that "[a] POSITA, and indeed any reader of the Krupka patent, would have understood that control signal 2 is *also* a logic zero when the sample is *above* the threshold voltage level." *Id.* at 20 (citing ON Mot., Ex. S ("Krupka") at 3:10–14). Indeed, ON concedes that it argued only obviousness to the PTAB (and not anticipation) "because Krupka does not explicitly state in words that the control signal 2 is a logic 0 if the measured voltage is *above* the threshold, as required by claim 19." *Id.* at 23. Given Krupka's silence on this issue, ON concedes that knowing what a POSITA would understand is required to evaluate anticipation. *Id.* at 23 ("Krupka does in fact disclose to a [POSITA] (*i.e.* anticipate) every element of claims 19 and 20 . . . ."). Without expert testimony (or indeed any other evidence) to support the position, ON has failed to demonstrate what a POSITA would understand with respect to Krupka's disclosures. Indeed, ON has not even informed the Court who the POSITA might be here.

This result is confirmed by a few additional points. First, in making similar arguments to the PTAB (albeit in the context of obviousness), ON relied on expert testimony to define the POSITA and to argue that Krupka's control signal 2 is a "feedback signal." *See, e.g.*, '471 FWD at 43 ("Petitioner also provides supporting testimony from Dr. Madisetti." (citing expert

21

testimony)). The PTAB expressly considered and accepted this testimony in reaching its holding. *See id.* at 46 (finding ON's "unchallenged [expert] testimony persuasive" with respect to whether "Krupka discloses all the elements of claims 1 and 19 to a person of ordinary skill"). ON does not submit similar testimony to this Court in support of its motion, and, as mentioned, does not argue that the PTAB ruling is somehow binding here. Second, PI submits expert testimony to support its argument that Krupka's control signal 2 does not satisfy the feedback signal element. *See* Kelley Decl. ¶¶ 17–23. This expert testimony demonstrates that it is not readily apparent what a POSITA would understand Krupka to mean. To be clear, the Court does not hold that Dr. Kelley's testimony creates a genuine issue of material fact. The Court recognizes that ON argues that Dr. Kelley "did not undertake the proper analysis of ON's contention that the control signal 2 satisfies the feedback signal limitation." ON Reply at 13. Instead, the Court holds that ON's contention is not supported by clear and convincing evidence, such that PI need not submit evidence to the contrary. The Court simply notes that the existence of expert testimony to answer the question is a further indication that ON should have submitted such testimony in support of its own arguments.

Because ON has not established by clear and convincing evidence that it is entitled to judgment as a matter of law that Krupka anticipates the '471 Patent, ON's motion is DENIED.

### 6. Non-Infringement of Claim 1 of PI's '876 Patent Based on Lack of Proof of Infringement

Finally, ON moves for summary judgment of non-infringement of claim 1 of the '876 Patent because claim 1 was amended in September 2018 following reexamination, but PI's only evidence is directed to the original version of claim 1, not the amended version. ON Mot. at 23–24. On June 21, 2019, the Court granted the parties' stipulation to withdraw this issue from ON's motion. ECF 270. Pursuant to that stipulation, this issue is **MOOT**.

### B. PI's Motion for Summary Judgment (ECF 224)

PI moves for summary judgment of eight issues: (1) whether ON is precluded from challenging the validity of PI's '876 and '079 Patents based on issue preclusion due to ON's privity with Fairchild Semiconductor International, Inc.[6] ("Fairchild"); (2) whether ON is

---

[6] *See* First Am. Ans. ¶ 4, ECF 96; Headley Decl., Ex. 5, ECF 224-7.

precluded from challenging the validity of PI's '876 and '079 Patents based on IPR estoppel; (3) whether ON's '862 Patent and '908 Patent are invalid as anticipated by PI's SMP3 product; (4) whether PI's accused products do not infringe ON's '601 Patent because they do not regulate output voltage; (5) whether PI's accused products do not infringe ON's '272 Patent because they do not have an internal temperature compensation circuit; (6) whether PI's accused products do not infringe the '933 Patent because they do not have a memory circuit; (7) whether PI's accused products do not infringe ON's '624 Patent because ON does not have any evidence that the products infringe; and (8) whether PI had notice of its infringement prior to filing the lawsuit such that it can be found to have willfully infringed. *See generally* PI Mot.

The Court addresses each issue in turn.

### 1. Issue Preclusion Based on Privity of ON's Validity Challenges to PI's '876 and '079 Patents

PI moves for summary judgment that ON is precluded from challenging the validity of the '876 and '079 Patents because ON is in privity with Fairchild Semiconductor, against whom final judgments of no invalidity of the '876 and '079 Patents were entered, or because ON sufficiently controlled the previous litigation.

The Court first recounts the relevant facts and then discusses the parties' arguments.

#### a. Relevant Facts

The facts relevant to deciding this issue relate to PI's suits against Fairchild and ON's acquisition of Fairchild.

On April 27, 2012, in a suit by PI against Fairchild, a jury found the '876 Patent valid and that Fairchild infringed. PI Mot., Ex. 11. On March 4, 2014, in a suit by PI against Fairchild, a jury found the '079 Patent valid and that Fairchild infringed. PI Mot., Ex. 12, ECF 224-14.

On September 14, 2015, ON and Fairchild entered into a confidentiality agreement related to a potential merger between the two companies. PI Mot., Ex. 4, ECF 224-6. This agreement stated in part that ON and Fairchild "share a common legal and commercial interest" and "are or may become joint defendants" with respect to information disclosed and reviewed in the process of negotiating the merger. *See id.* ¶ 16. On November 18, 2015, ON and Fairchild agreed to

merge, subject to satisfaction of certain conditions precedent.  *See* PI Mot., Ex. 3, ECF 224-5.

On March 29, 2016, ON filed an IPR on the '079 Patent, the first of many IPRs filed by ON with respect to patents that Fairchild had been found to infringe or had been sued for infringing.  PI Mot., Ex. 10 at 4, ECF 224-12.  On September 19, 2016, the ON/Fairchild merger closed.  PI Mot., Ex. 5.  Fairchild became a wholly owned subsidiary of ON.  *Id.*; PI Mot., Ex. 6 at 2, ECF 224-8.

On December 12, 2016, the Federal Circuit affirmed the '876 validity judgment.  PI Mot., Ex. 7, ECF 224-9.  On March 10, 2017, the district court entered the final '079 validity judgment, which ON did not appeal.  PI Mot., Exs. 8 & 9, ECF 224-10, 224-11.

### b.  Discussion

"Issue preclusion bars relitigation of issues adjudicated in an earlier proceeding if three requirements are met: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding."  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (citing *Kourtis v. Cameron*, 419 F.3d 989, 994 (9th Cir. 2005)).  The parties here primarily dispute whether the third requirement is satisfied—that is, whether ON is sufficiently in privity with Fairchild to warrant issue preclusion.  ON also argues that the first requirement is not satisfied because only some of the claims of the asserted patents were found invalid in the prior proceedings.  The Court agrees with ON that PI has not sufficiently demonstrated that the validity of claims 14 and 15 of the '876 Patent was adjudicated previously.  *See* PI Mot. at 4 n.2 (noting, without citation, that these claims may not be materially different from the claims adjudicated previously).  However, because the Court also agrees with ON that ON was not and is not "in privity" with Fairchild for the purposes of this lawsuit, the Court focuses its analysis on the third requirement.

PI asserts two theories for why ON is bound by issue preclusion here: (1) ON acquired all of Fairchild's assets, such that "ON *is* Fairchild" and thus must, through privity as Fairchild's successor-in-interest, be bound by the judgments previously entered against its wholly owned

24

subsidiary, PI Mot. at 5; and (2) ON sufficiently controlled the Fairchild litigation to preclude it from relitigating the validity issues here. The Court turns now to each of these theories.

### i. Asset Acquisition

PI argues that because ON is Fairchild's successor-in-interest "ON *is* Fairchild" and thus should be bound by prior judgments against Fairchild, including the judgments of validity of the '876 and '079 Patents. PI Mot. at 4–6; PI Reply at 1–6. ON counters that privity follows the assets transferred, such that ON could only be held to be in privity with Fairchild if the accused products in this case were products that ON acquired from Fairchild ("legacy-Fairchild products"). Because the accused products at issue in this case are indisputably products ON developed before its acquisition of Fairchild ("legacy-ON products"), ON argues that it is not in privity with Fairchild as to those legacy-ON products and thus this lawsuit. In reply (and briefly in its motion), PI argues that "the accused products are irrelevant" because the issue PI seeks to preclude ON from rearguing is patent validity, and questions of patent validity have nothing to do with the products accused of infringement. PI Reply at 5; *see also* PI Mot. at 6; PI Reply at 1–5.

In making these arguments, each party relies on and distinguishes many useful cases. Ultimately, the Court believes these cases support ON's position. The Court first recounts this case law in detail and then applies it to the facts here.

### a. Relevant Law

Just over a decade ago, the Supreme Court in *Taylor v. Sturgell* clarified the scope of "[t]he preclusive effect of a federal-court judgment" on a nonparty to the case in which the judgment was issued. 553 U.S. 880 (2008). The Supreme Court first described that the doctrines of claim and issue preclusion generally do not apply to nonparties to the prior suit because the nonparties will not have had a "full and fair opportunity to litigate the claims and issues" in the previous suit. *Id.* at 892 (internal quotation marks omitted). But the Supreme Court went on to enumerate six categories of exceptions to this general rule, *id.* at 893, explaining that the categories did not serve as a "definitive taxonomy," *id.* at 893 n.6. Those categories are as follows: (1) the nonparty agrees to be bound by the determination in the first action, *id.* at 894; (2) the nonparty has a "pre-existing substantive legal relationship[]" with a party to the judgment, such as "preceding and succeeding

owners of property, *id.* (citation omitted) (citing Restatement (Second) of Judgments §§ 43–44;

18A C. Wright, A. Miller, & E. Cooper, Fed. Prac. and Proc. § 4448, at 329 (2d ed. 2002)); (3) the

nonparty was adequately represented in the first action by someone with the same interests, such

as in a class action, *id.* at 894–95; (4) the nonparty "assumed control over the litigation in which

the judgment was rendered," *id.* at 895 (alteration and citation omitted); (5) the nonparty is

bringing suit as a representative (or proxy) of a person who was a party to the previous action, *id.*;

and (6) the nonparty is barred by statute from relitigating an issue already adjudicated, *id.*  In

rejecting the more expansive doctrine of so-called "virtual representation," the Supreme Court

reiterated that the exceptions to the general rule barring nonparty preclusion are "discrete" and

"apply in limited circumstances." *Id.* at 898 (citation omitted).  Ultimately the Supreme Court

instructed lower courts that "[t]he preclusive effects of a judgment in a federal-question case

decided by a federal court should instead be determined according to the established grounds for

nonparty preclusion described in this opinion," *i.e.*, the delineated categories. *Id.* at 904.

Most relevant to the current discussion is category two—a pre-existing substantive legal

relationship, specifically through succession of property—between a nonparty and a party to the

previous adjudication.  In defining this category, the Court cited both the Second Restatement of

Judgments ("Restatement") and Wright and Miller.  The cited Restatement sections describe that

"[a] judgment in an action that determines interests in real or personal property . . . with respect to

the property involved in the action: . . . [h]as preclusive effects upon a person who succeeds to the

interest of a party." Rest. (Second) of Judgments § 43.  But "[w]ith respect to other property held

by a party to the action, [the judgment] does not preclude a person who is a successor in interest

thereof." *Id.*; *see also id.* § 44 (governing transfers of property while action is pending).  Put

another way, "if the action is regarded as having concerned 'property,' the determinations in the

action delimit the property interest of the parties and therefore establish what passes to their

successors to the interest." *Id.*; *see also id.* ("A successor is also bound by the determination of

issues concerning the property that he has received.").

The Wright and Miller section cited in *Taylor* confirms that "persons holding successive

interests in the same property or claim can preclude each other."  18A Fed. Prac. & Proc. Juris. §

4448. "In each case, the underlying analysis begins with the requirements of sound property relationships . . . rather than an effort to implement concepts of participation or representation." *Id.* Elsewhere, Wright and Miller states clearly that preclusion for successive ownership in property is "limited to the property involved in the judgment; if the vanquished party transfers different property, the recipient is not precluded by the judgment." *Id.* § 4462.

The parties cite various circuit court opinions applying this case law in patent cases. In *Kloster Speedsteel AB v. Crucible Inc.*, the Federal Circuit held that Kloster was in privity with its predecessor-in-interest Stora because Kloster had "purchased the facility Stora used to manufacture the products found to infringe." 793 F.2d 1565, 1581 (Fed. Cir. 1986), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004). In a previous action, Stora had been found to infringe the plaintiff's patent by manufacturing and selling the patented products. Kloster argued that the injunction issued against Stora's "successors in interests and assigns" exceeded legal bounds because Kloster was not a party to the prior action. *Id.* at 1581–83. The Federal Circuit disagreed, noting that "[c]ourts have repeatedly found privity where, after a suit begins, a nonparty acquires assets of a defendant-infringer." *Id.* at 1583. Because Kloster was "the successor-operator of Stora assets used to produce infringing products," Kloster could not skirt the injunction based on a lack of privity. *Id.* If Kloster wanted to avoid the injunction, the Federal Circuit noted, it could do so "by simply refraining from infringement." *Id.* "That [Kloster] desire[d] to continue Stora's infringement appears the only possible basis for its strenuous effort to evade the injunction." *Id.*

In *Brunswick Corp. v. Chrysler Corp.*, the Seventh Circuit determined that Chrysler was in privity with The West Bend Company ("West Bend"), such that Chrysler was bound by a prior consent decree of invalidity and infringement of two patents against West Bend. 408 F.2d 335, 336, 338 (7th Cir. 1969). "To determine whether privity existed," the court of appeals asked "whether Chrysler ha[d] succeeded in interest to the subject matter of the prior decree." *Id.* at 338. Because Chrysler had "purchased from The West Bend Company the entire business that was devoted to the production of [the infringing products]" and because West Bend had "ceased all operations in the field of [the infringing products], [and] transferred both its manufacturing and

sale facilities and also its personnel to Chrysler," the court of appeals found that "Chrysler succeeded in interest to the subject matter of the prior decree" and was thus "in privity with The West Bend Company" and bound by the decree. *Id.*

At least one district court has considered the application of *Brunswick* in a case directly analogous to the present action, finding that there was no privity where the accused products differed between the two actions. In *Crossroads Systems (Texas), Inc. v. Dot Hill Systems Corp.*, the district court held that successor-in-interest Dot Hill was not precluded from arguing patent invalidity even though it had acquired Chapparal, a company that had previously lost in a jury trial finding the patent valid and that Chapparal infringed. No. A-03-CA-754-SS, 2006 WL 1544621, at *4–*6 (W.D. Tex. May 31, 2006). The plaintiff argued in part that Dot Hill was in privity with Chapparal because it had succeeded to Chapparal's interest in property. *Id.* at *6. In rejecting this argument, the court distinguished *Brunswick* because "the accused products [in the second case] [were] not the same as the accused products [in the first case]." *Id.* The court noted that "[a]lthough a transfer of property may give rise to privity, it is only a limited kind of privity," binding a party only as to the "adjudication of rights *in the property that was transferred*." *Id.* at *7 (quoting *Int'l Nutrition*, 220 F.3d at 1329). Recognizing that the only products at issue in the case were legacy-Dot Hill products, not products acquired from Chapparal, the district court held that "Dot Hill is not in privity with Chapparal with respect to [Dot Hill's] original products" such that "collateral estoppel should not apply to Dot Hill's validity defendants to the '972 patent." *Id.* (citing *Pall Corp. v. Fisher Scientific Co.*, 962 F. Supp. 210 (D. Mass. 1997)). The district court recognized (through analogy to another case) that finding privity only for acquired products and not for nonacquired products might create "inconsistent result[s]" wherein the patent is found invalid in a prior action as to a company's acquired, but then is later found valid as to the company's nonacquired products. *Id.* But the court found that this potential inconsistency was not present in the case because none of the acquired products were accused of infringement. *Id.*

Outside of the patent context, the Federal Circuit and Ninth Circuit have further clarified how to analyze successor-in-interest privity. In *International Nutrition Co. v. Horphag Research, Ltd.*, the Federal Circuit held that successor-in-interest INC was not barred in cancellation

28

proceedings from challenging Horphag's eligibility to register for a trademark, even though INC's

predecessor SCERPA had previously asserted the same challenge against Horphag and lost. 220

F.3d 1325, 1329–30 (Fed. Cir. 2000). SCERPA had assigned a French trademark to INC, but

neither of the two challenges to Horphag's eligibility had "involve[d] INC's rights in the French

trademark." *Id.* at 1329. Because INC's assertion of rights in the subsequent proceeding did not

involve the assigned property rights, it was not barred from challenging Horphag's eligibility

based on its other, nonacquired interests. *Id.* at 1330.

In so holding, the Federal Circuit relied on a corollary to the rule that "a judgment with

respect to a particular property interest may be binding on a third party based on a transfer of the

property at issue to the third party after judgment." *Id.* at 1329 (citing 2 Rest. of Judgments § 43).

According to the Federal Circuit, "when one party is a successor in interest to another with respect

to particular property, the parties are in privity only with respect to an adjudication of rights in the

property that was transferred; they are not in privity for other purposes, such as an adjudication of

rights in other property that was never transferred between the two." *Id.* (citing Wright & Miller §

4462). "Put another way, the transfer of a particular piece of property does not have the effect of

limiting rights of the transferee that are unrelated to the transferred property." *Id.* (citing *Munoz v.*

*County of Imperial*, 667 F.2d 811, 816 (9th Cir. 1982)). *Cf. Epistar Corp. v. Int'l Trade Comm'n*,

566 F.3d 1321, 1334 (Fed. Cir. 2009) (citing *International Nutrition* and Restatement (Second) of

Judgments § 43 in holding that a successor-in-interest's acquisition of a party bound by a previous

judgment "does not have the effect of limiting [the successor's] rights that are unrelated to the

product lines it acquired from [the bound party]").

In recounting this corollary to the rule of successor-in-interest privity, the Federal Circuit

cited the Ninth Circuit's *Munoz* case. In *Munoz*, the Ninth Circuit held that water purchasers were

not barred by issue preclusion from arguing that a conditional use permit imposed on the water

seller was unconstitutional, even though the seller had lost his right to challenge the

constitutionality of the permit in a previous litigation. *See* 667 F.2d at 813. The county argued

that the purchasers should be bound to the scope of the seller's rights because the seller was

simply conferring contractual rights to the water to the purchasers. The Ninth Circuit agreed that

29

"[i]f it can be made to appear that the right at issue here is a right which the [purchasers] only obtained through contractual relations with [the seller], then it does indeed follow that they are in privity with him." *Id.* at 816. Indeed, it is "hornbook law that in sales transaction the buyer only gets whatever the seller has." *Id.* But the Ninth Circuit rejected this argument because the purchasers' arguments did not rely on their contractual rights to the water, but instead relied on their "independent right deriving directly from the Commerce Clause," a right which they did not inherit from the seller. *Id.* Thus, because "[t]he right which the [purchasers] [sought] to litigate [was] not one which they obtained through contractual relations with [the seller]," they were not in privity with the seller and were not barred by issue preclusion. *Id.*

Having summarized the relevant case law preceding the present action, the Court also briefly recounts the Federal Circuit's tangentially relevant holding in the '079 IPR between PI and ON. The procedural posture of the ruling requires a bit of discussion. On June 13, 2019, the Federal Circuit vacated the final written decision in the ON-initiated IPR of PI's '079 Patent. *See* '079 Appeal at 2. The question the Federal Circuit addressed in that appeal was whether ON's petition for IPR was timely under 35 U.S.C. § 315(b), which states that "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." The answer to this question turned on whether the "one year" ran from the date of the filing of the petition or the date of the petition's institution. The answer to that question was dispositive because of the differing relationship between ON and Fairchild on those two dates.

PI had served Fairchild with a complaint for infringement on November 6, 2009. '079 Appeal at 3. As recounted above, on November 18, 2015, ON entered into an agreement to merge with Fairchild. On March 29, 2016, while the merger was pending, ON filed the IPR petition— more than one year after Fairchild was served with the infringement complaint in 2009. On September 19, 2016, the merger closed, and on September 23, 2016, the Board instituted the IPR. PI argued to the PTAB that the petition was untimely because "ON and Fairchild were in privity at the time of the filing [of the petition] and Fairchild had been served with a complaint for

United States District Court
Northern District of California

infringement more than one year before the petition was filed." *Id.* at 4. The PTAB rejected this argument because "there was insufficient evidence to establish privity between Fairchild and ON at the time the petition was filed" in March 2016. *Id.* at 5. PI later argued to the Board that the IPR was time-barred because Fairchild, a party barred from filing the IPR, was a real party in interest ("RPI") at the time the IPR was *instituted*, due to Fairchild's merger with ON four days before institution. *Id.* at 6. The PTAB held that only RPI and privity relationships before "*the date the petition is filed*" are relevant to the time-bar question. *Id.* at 6.

The Federal Circuit disagreed with this holding and vacated on this ground, holding that privity and RPI relationships arising after filing but before institution should be considered for purposes of the § 315(b) time-bar. *See id.* at 13–14. Because "Fairchild was an RPI at the time the IPR was instituted, even though it was not an RPI at the time the petition was filed," the Federal Circuit held that the petition was time-barred.[7] *Id.* at 21. In reaching this holding, the Federal Circuit noted that "[t]he primary issue is one of statutory interpretation." *Id.* at 12; *see also id.* at 14–16. In interpreting the statute in PI's favor, the Federal Circuit noted in part that its reading of the statute was "consistent with common law preclusion principles." *Id.* at 15. In finding that "the AIA recognized the term 'privity' has acquired an expanded meaning focused on the 'practical situation,'" the Federal Circuit cited the legislative history of the AIA in which Senator Kyl stated that "[p]rivity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question." *Id.* at 16 (quoting 157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl)). The Federal Circuit then cited *Kloster* for the proposition that "preclusion can apply based on privity arising after a complaint is filed," analogizing the filing of a complaint to the filing of the IPR petition. *Id.*

b. Analysis

ON argues that this case law demonstrates that privity follows the product; because the accused products in this case are legacy-ON products, not products acquired from Fairchild, ON

---

[7] Notably, the Federal Circuit did not address PI's argument that ON "was in privity with Fairchild at the time the petition was filed." '079 Fed. Cir. at 21.

cannot be estopped from arguing invalidity here. PI argues that this case law demonstrates that when a company fully acquires another company, the successor company is bound by the judgments against the acquired party irrespective of the property acquired. At the very least, PI argues, the successor is bound on issues of patent validity, which, as a matter of substantive law, have nothing to do with the accused products.

The Court agrees with ON and the court in *Crossroads*—privity follows the product at issue in the original action. *Taylor* instructs that the exceptions to the general rule against nonparty preclusion are "discrete" and "apply in limited circumstances" to the "established grounds" set forth in the opinion. 553 U.S. at 904. In discussing the ground of privity based on "preceding and succeeding owners[hip] of property," *Taylor* cited the Second Restatement of Judgments and Wright and Miller. The Restatement and Wright and Miller both make clear that privity follows the property acquired. The Restatement shows that the original judgment attaches to the property, stating that successors to "property involved in the action" are bound by the judgment, whereas successors to "other property held by a party to the action" but not at issue in the previous action are not similarly bound. *See* 2 Rest. of Judgments § 43. "The determinations in the action delimit the property interest of the parties and therefore establish what passes to their successors in interest." *Id.* Wright and Miller reiterates that preclusion is "limited to the property involved in the judgment." 18A Fed. Prac. & Proc. Juris. § 4462.

*Kloster*, *Brunswick*, *International Nutrition*, and *Munoz* confirm that privity follows the property at issue in the original action. *Kloster* and *Brunswick* relied explicitly on the transfer of the property at issue in the original action in holding that the acquiring party was in privity with a party to the action. In *Kloster*, the Federal Circuit held that because Kloster was "the successor-operator of Stora assets used to produce infringing products," it was in privity with Stora with respect to the injunction barring production of those products. 793 F.2d at 1583. Similarly, in *Brunswick*, the court of appeals asked "whether Chrysler ha[d] succeeded in interest to the subject matter of the prior decree"; because the answer was yes, Chrysler was in privity with West Bend. 408 F.2d at 338. The courts in *International Nutrition* and *Munoz* make clear that a company maintains the legal rights it had prior to acquiring another company, even if the acquired company

32

has lost those rights with respect to the transferred property. In *International Nutrition*, the Federal Circuit could not have been clearer when it stated that "the transfer of a particular piece of property does not have the effect of limiting rights of the transferee that are unrelated to the transferred property." 220 F.3d at 1329. The Ninth Circuit in *Munoz* similarly held that if "[t]he right which the [acquiring party] [sought] to litigate [was] not one which they obtained through contractual relations with [the seller]," the acquiring party is not in privity for the purposes of the second action. 667 F.2d at 816.

To the extent the Federal Circuit opinion in the '079 IPR even touches on this issue, it confirms that at common law privity "should extend to parties to transactions and other activities *relating to the property in question*." '079 Appeal at 16 (emphasis added) (quoting 157 Cong. Rec. S1376). However, the Federal Circuit's opinion is of little value here, because in that case it was undisputed that Fairchild was a real party in interest to the IPR at the relevant time.

Under this case law, ON is not in privity with Fairchild because this action does not involve products that ON acquired from Fairchild. Because ON had the independent right to challenge the validity of PI's patents with respect to its own products before it acquired Fairchild, it maintained that right even after it acquired Fairchild's infringing products. ON is not in privity with Fairchild with respect to products that it did not acquire from Fairchild. This result mirrors the result in *Crossroads*, which this Court finds to be well-reasoned. Though this holding may lead to the asserted patents being held valid against some ON products (those acquired from Fairchild) and invalid against other ON products (if the jury in this case finds the patents invalid), such a result is simply the reality of privity-by-property. The result is no different than that in *Munoz*, where the permit was constitutional as to the seller but perhaps not as to the purchasers.

PI's arguments and case cites do not require a different result. PI does not cite a single case in which a party was bound by a prior judgment because it acquired property that was not subject to the prior litigation. Notably, to the extent PI's argument relies on substantive patent law—that the accused products are irrelevant to patent validity arguments—PI does not cite a single case in which the *substantive law* at issue in the case was the deciding factor for a privity-by-property theory. This makes sense, as issue preclusion does not vary based on the substantive

33

law at issue in the case.  To the extent they are not discussed and distinguished above, the cases that PI otherwise cites are distinguishable and thus not persuasive.  *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006) (party in second suit was same party bound by first suit); *Roche Palo Alto LLC v. Apotex, Inc.*, 526 F. Supp. 2d 985, 994 (N.D. Cal. 2007), *aff'd*, 531 F.3d 1372 (Fed. Cir. 2008) (same);  *Elan Microelectronics Corp. v. Apple, Inc.*, No. C 09-01531 RS, 2010 WL 4510909, at *3 (N.D. Cal. Nov. 1, 2010) (defendant sought to preclude successor to patent from arguing differing claim construction than predecessor patent owner made in prior case);  *Astrazeneca UK Ltd. v. Watson Labs., Inc. (NV)*, 905 F. Supp. 2d 596, 603 (D. Del. 2012) (holding issue preclusion warranted where successor had control over prior litigation); *Finjan, Inc. v. Symantec Corp.*, No. 14-CV-02998-HSG, 2017 WL 6059043, at *2 (N.D. Cal. Dec. 7, 2017) (finding on motion to dismiss that the plaintiff had plausibly pled privity based on a theory of control over the previous litigation); *Bingo Card Minder Corp. v. Power Bingo Corp.*, No. C 96-1048 FMS, 1996 WL 711515, at *4 (N.D. Cal. Nov. 25, 1996) (relying on concept of "virtual representation," which the Supreme Court disapproved of in *Taylor*).

Thus, the Court finds that ON is not in privity with Fairchild under this category of nonparty preclusion and is thus not precluded from arguing that the asserted patents are invalid.

### ii.    Control Over Previous Litigation

PI also secondarily argues in its motion that ON had sufficient control over the previous litigation against Fairchild to warrant finding that ON is estopped from arguing invalidity here.  PI does not substantially reraise this issue in reply.  The key facts to which PI points to demonstrate that ON sufficiently controlled the Fairchild '079 and '876 Patent litigations is that "ON began acting in concert with Fairchild on PI patent matters by September 14, 2015 (the date of the confidentiality agreement), more than a year before the Federal Circuit affirmed the validity of the '876 patent on December 12, 2016, and the merger closed on September 19, 2016, nine months before Fairchild/ON decided not to appeal validity of the '079 patent on July 5, 2017."  PI Mot. at 5.  PI does not present evidence that ON had any relationship to Fairchild prior to September 2015 or prior to the two jury trials finding the patents valid, in 2012 and 2014 respectively.

The Supreme Court in *Taylor* defined the "control" exception to the general rule against

34

nonparty preclusion by noting that a nonparty in "control" circumstances has "the opportunity to present proofs and argument," and thus "'had his day in court,' even though he was not a formal party to the litigation." 553 U.S. at 895 (quoting Restatement (Second) of Judgments § 39 (1982)). The Restatement states that "[t]o have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action." Restatement (Second) of Judgments § 39. The Ninth Circuit has stated that "[t]o determine whether a nonparty 'assumed control over' a previous action so as to be bound by its judgment, a court must evaluate whether the 'relationship between the nonparty and a party was such that the nonparty had the same practical opportunity to control the course of the proceedings.'" *United States v. Bhatia*, 545 F.3d 757, 760 (9th Cir. 2008) (quoting 18A Wright & Miller, Fed. Prac. & Proc. § 4451, at 373 (2d ed. 2002). In that case, the Ninth Circuit interpreted the Supreme Court as requiring that the nonparty have a sufficient "laboring oar" in the original litigation. *Id.* (quoting *Montana v. United States*, 440 U.S. 147, 155 (1979)).

The Court agrees with ON that PI has not demonstrated that ON sufficiently controlled the two previous actions against Fairchild to warrant precluding ON from arguing invalidity here. In each prior case against Fairchild, the jury had entered its verdict before ON and Fairchild had any connection (2012 and 2014 vs. late-2015). Thus, ON did not have the opportunity to present "proofs and argument" or to "have effective choice to the legal theories and proofs" advanced by Fairchild. ON has not had its day in court on these issues. PI does not cite a single case in support of its argument, much less a case that shows that having control over the decision to appeal is enough to to hold that a successor had sufficient control over prior litigation to warrant issue preclusion. That ON filed IPRs on behalf of Fairchild in 2016 does not indicate that it had control over the Fairchild litigation at an earlier date. In sum, PI's evidence falls far short of demonstrating that ON carried the "laboring oar" over the prior litigation, which is necessary to find that it sufficiently controlled the prior litigation.

Thus, as with its privity-by-property theory, PI has not shown that the "control" theory of nonparty preclusion binds ON here. As such, PI's motion on this issue is DENIED.

**IPR Estoppel of ON's Validity Challenges to PI's '876 and '079 Patents**

PI requests that the Court hold that ON is statutorily precluded under 35 U.S.C. § 315(e)(2) from challenging the validity of claims 14–15 of the '876 Patent and all asserted claims of the '079 Patent. *See* PI Mot. at 6–8. ON challenged the patentability of these claims in respective IPRs. *See ON Semiconductor Corp. v. Power Integrations Inc.*, Case No. IPR2016-00809 ("'079 IPR"); *Semiconductor Components Industries, LLC v. Power Integrations Inc.*, Case No. IPR2016-01589 ("'876 IPR"). The PTAB instituted the IPRs and issued Final Written Decisions in both. *See* PI Mot., Exs. 15 & 16, ECF 224-16, 224-17. The Federal Circuit vacated both Final Written Decisions as time-barred and remanded with instructions to dismiss the IPRs. *See Power Integrations Inc. v. Semiconductor Components Industries, LLC*, No. 18-1607, ECF 88 at 2 (Fed. Cir. June 13, 2019) ("'079 Appeal"), ECF 268-1; *Power Integrations Inc. v. Semiconductor Components Industries, LLC*, No. 18-1705, ECF 57 at 2 (Fed. Cir. June 13, 2019) ("'876 Appeal"), ECF 268-3.

Under § 315(e)(2), "[t]he petitioner in an inter partes review . . . that results in a final written decision . . . or the real party in interest or privy of the petitioner, may not assert . . . in a civil action . . . that [a] claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2). By the statute's plan terms, for a petition to be estopped under the statute, the IPR must result in a final written decision. Though the IPRs here resulted temporarily in final written decisions, those decisions were vacated, which "removes all precedential value from a decision, rendering an opinion a legal nullity." *Animal Legal Def. Fund v. Veneman*, 490 F.3d 725, 730 (9th Cir. 2007) (en banc) (Thomas, C.J., concurring in part and dissenting in part); *see Camreta*, 131 S.Ct. at 2025 ("Vacatur then rightly strips the decision below of its binding effect, and clears the path for future relitigation." (citations omitted)). Because there are no final written decisions in the IPRs, an essential element for IPR estoppel is absent here.

As such, PI's motion is DENIED.[8]

_____

[8] On July 29, 2019, ON petitioned the Federal Circuit for rehearing en banc in both appeals. *See* '079 Appeal, ECF 94; '876 Appeal, ECF 63. If the Federal Circuit grants rehearing en banc,

### 3. Invalidity of ON's '862 and '908 Patents Due to Anticipation by PI's SMP3 Product

PI moves for summary judgment of invalidity of the asserted claims of ON's '862 and '908 Patents because the claims are anticipated by PI's SMP3 chip product. PI Mot. at 8–13. According to PI, its SMP3 product "was an integrated circuit for power supply applications and was designed and sold by Power Integrations in the early 1990s." PI Mot. at 9 (citing PI Mot., Ex. 20, ECF 224-21). As evidence of the structure, function, and operation of the SMP3 device, PI submits a SMP3 Datasheet, dated July 1991 (PI Mot., Ex. 20), and SMP3 design schematics, dated March 1990 (PI Mot., Ex. 24, ECF 224-26). As evidence that the product was publicly known and used, it also submits documentation related to the SMP3 Evaluation board. *See* PI Mot., Ex. 25, ECF 224-27. PI argues, based on the datasheet and schematics, that the SMP3 product anticipates ON's '862 and '908 Patents. *See* PI Mot. at 12–13.

In opposition, ON makes several arguments as to why summary judgment is inappropriate here. First, ON argues that PI has not demonstrated that either the SMP3 product or the datasheet are prior art because PI has not presented sufficient evidence that the product was sold or in public use or that the datasheet was a printed publication at the relevant time. *See* ON Opp. at 10–11. Second, ON argues that even if the product was on sale and thus is prior art, "there is a genuine issue of material fact as to how the SMP3 product operates and whether the schematic . . . is the schematic for the SMP3 product" because PI has not introduced evidence connecting the datasheet and schematic to the product allegedly sold or fact evidence (as opposed to expert testimony) demonstrating how the schematics operate. *Id.* at 11–12. Third, ON argues that there is a genuine issue of material fact as to whether the datasheet and schematic show that the SMP3 product practices every element of the asserted claims. *Id.* at 12–13.

The Court agrees with a combination of ON's first and second arguments, and thus does not reach the remainder of ON's arguments. PI bears the burden of proof on invalidity by clear and convincing evidence. *See i4i Ltd. P'ship*, 564 U.S. at 95.

Under the pre-America Invents Act version of 35 U.S.C. § 102(b), a patent claim is invalid

---

Power Integrations may request that the Court reconsider its ruling on this issue.

if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." The '908 and '862 Patents claim an effective filing date of June 4, 1997. *See* PI Mot., Exs. 22–23, 29. The Court first considers the SMP3 product itself, and then the SMP3 documentation (the datasheet and schematics, Exs. 20 and 24).

As to the SMP3 product, which is the asserted prior art, even assuming PI's evidence is sufficient to demonstrate that the product was on sale, PI has failed to marshal clear and convincing evidence that the SMP3 product anticipates the patents. PI's anticipation arguments with respect to the *product* rely wholly on the datasheet and schematics. *See* PI Mot. at 10–12 (citing only datasheet, schematics, and expert testimony relying on these two documents). But PI does not present any evidence to the Court that the datasheet accurately reflects how the product as allegedly sold actually operates. Thus, PI's arguments that the datasheet and schematics show that *the product* anticipates the patents is missing a crucial evidentiary foundation, namely that the datasheet and schematics represent the product as sold. Notably, PI does not refute ON's arguments on this point in its reply. *See* PI Reply 7–9. Without this evidence, PI's expert reports lack foundation. Thus, PI has not demonstrated that the SMP3 product anticipates the patents.

To the extent that PI may be offering the datasheet and schematics as prior art, which is not the subject of this motion, the Court agrees with ON that PI has not presented clear and convincing evidence that the documents were publicly accessible. "In order to qualify as a printed publication within the meaning of § 102, a reference must have been sufficiently accessible to the public interested in the art. . . . A reference is considered publicly accessible if it was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009) (internal quotation marks and citations omitted). PI's evidence regarding public accessibility pertains only to the product itself, not to the datasheets or schematics. *See, e.g.*, PI Mot., Ex. 18 at 132:10–22 (testimony of PI Inventor and current President and CEO Balu

Balakrishnan) (discussing SMP3 chip product).[9] Nothing on the face of the datasheets and schematics themselves indicates that either document was publicly available or accessible. *See id.*, Exs. 20 and 24. Indeed, the schematics are under seal in this litigation. *See* ECF 251. Without evidence regarding the documents' public availability, PI has not demonstrated that the datasheet or schematics anticipate the patents.

Because PI has not established by clear and convincing evidence that it is entitled to judgment as a matter of law that the SMP3 product or the datasheet and schematics anticipate ON's '862 and '908 Patents, PI's motion is DENIED.

### 4. Non-Infringement of ON's '601 Patent Because PI's Products Do Not Regulate the Output Voltage

PI asks the Court to grant summary judgment of non-infringement of ON's '601 Patent because PI's accused products do not regulate the output voltage, as required by the asserted claim (claim 10).

The '601 Patent claims a structure and method for preventing damage to a power controller under large load conditions by determining the value of an input power and using that value to regulate a value of the output voltage. *See* PI Mot., Ex. 30 ("'601 Patent") at 1:21–23; *id.* at 6:47–50. ON asserts claim 10 here. *See, e.g.*, ON Third Am. Compl. ¶ 135. Claim 10 recites:

> 10. A method of forming a power supply controller:
>
> > coupling the power supply controller to receive a first signal representative of an input voltage and a second signal representative of an input current and responsively form a power signal representative of an input power;
> >
> > coupling the power supply controller to receive a feedback signal representative of an output voltage; and
> >
> > coupling the power supply controller to *form drive pulses to regulate the output voltage* responsively to the power signal and the feedback signal including coupling the power supply controller to divide the power signal by the feedback signal.

'601 Patent at 8:11–123 (emphasis added).

PI's non-infringement arguments relate to the emphasized limitation "form drive pulses to

---

[9] The Court does not consider PI's evidence with respect to what ON's subsidiary Fairchild argued in previous suits because PI does not argue that ON is bound on this issue by those arguments, and because the Court rejects PI's privity arguments above.

regulate the output voltage." PI Mot. at 13–17. At claim construction, the Court construed this limitation as "form drive pulses that are used to maintain the output voltage substantially at a desired value." ECF 196 at 9–12. In adopting this construction, the Court noted that inclusion of the term "a desired value" in the construction "does not require that the output voltage be maintained at a constant value, but instead allows variation of the output voltage within acceptable tolerances around a desired value that may change." *Id.* at 11–12 (alteration and citation omitted).

PI argues that its accused products (the LYTSwitch-3 and LYTSwitch-5 product families), which are intended for use in light emitting diode ("LED") light bulbs, do not practice this limitation because the products "regulate output *current*, not output voltage." PI Mot. at 13. In support of this argument, PI first submits both product datasheets and technical witness testimony. The product datasheets consistently reference regulating the output current and make no mention of regulating the output voltage. *See id.*, Ex 31 at 1 (LYTSwitch-3 datasheet entitled "Single-Stage LED Driver IC with Combined PFC and *Constant Current Output* for Outstanding TRIAC Dimming in Isolated and Non-Isolated Topologies" (emphasis added)); *id.*, Ex. 31 at 1 ("The LYTSwitch™-3 family is ideal for single-stage power factor corrected *constant current* LED bulbs and downlighters." (emphasis added)); *id.*, Ex. 31 at 5 ("The output can drive an LED load from 68 V to 76 V with a *constant output current* of 115 mA ±3% . . . ." (emphasis added)); *id.*, Ex. 31 at 6 ("In order to maintain very tight *output current regulation* . . ." (emphasis added)); *accord id.*, Ex. 32 at 1,4, 5 (LYTSwitch-5 datasheet). Similarly, PI's technical witness testified that the products regulate output current because LEDs require a "very accurate current" to maintain efficiency. *See id.*, Ex. 33 ("Saint-Pierre Depo.") at 189:5–190:14; *see also* Saint-Pierre Depo. at 203:24–204:6, 211:20–212:20. He also testified that "[i]t doesn't make any sense" to "regulate the light of an LED with voltage," as opposed to current. *Id.* at 191:6–12.

PI then counters the arguments it anticipates ON will make in its opposition. The Court addresses each of these points and ON's counterpoints (or lack thereof) in turn.

First, PI argues that ON's infringement contentions contain no evidence for their conclusory assertions "on information and belief" that "the drive pulses that are formed [in the products] regulate the output voltage, or in the alternative under the doctrine of equivalents, the

equivalent output current." PI Mot. at 14–15 (PI Mot., Ex. 34 at 10 (LYTSwitch-3), ECF 224-35;

PI Mot., Ex. 35 at 11 (LYTSwitch-5), ECF 224-36). ON does not refute this argument, failing to

point to any evidence in its infringement contentions that might support these assertions. *See* ON

Opp. at 13–14. Having reviewed the contentions, the Court agrees with PI that they do not contain

evidence sufficient to create a triable issue of fact. *Cf. F.T.C. v. Publishing Clearing House, Inc.*,

104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts

and any supporting evidence, is insufficient to create a genuine issue of material fact.").

Second, PI argues that the report of ON's expert, Dr. Madisetti, likewise does not create a

triable issue of fact. PI identifies four potential foundations for Dr. Madisetti's infringement

arguments (PI Mot. at 15–17): (1) regulating the output current equates to regulating the output

voltage under Ohm's Law ($V = IR$; or voltage = current x resistance); (2) the products have

overvoltage-protection functions the would disable the switch if the output voltage were to rise

above some threshold value; (3) the products can "drive an LED load from 70V to 80V," which

equates to "maintaining the output voltage at a desired value (i.e., 75V) within a tolerance (i.e., +/-

5 V)," *id.*, Ex. 36 ("Madisetti Report") at 15; and (4) under the doctrine of equivalents, the

products perform the same function ("regulating the output from a power supply to the load") in

substantially the same way to achieve the same result as the claim limitation, *id.* at 10. PI refutes

the merits of all four potential arguments and also argues that the Court should strike theories two

and three because the theories are not contained in ON's infringement contentions. ON focuses

exclusively on theory one in its opposition. It does not rely on theories two through four to create

a triable issue of fact.

Starting with theories two and three, the Court agrees with PI that these theories are new

theories not contained in ON's infringement contentions and thus should be stricken. Neither of

the product features underpinning these theories—the overvoltage protection functions or the LED

load-driving function—is discussed in ON's infringement contentions with respect to this

limitation. *See* PI Mot., Ex. 34 at 10–12; PI Mot., Ex. 35 at 10–13. ON's failure to disclose these

features violates this district's Patent Local Rules. Patent Local Rule 3-1, which governs

infringement contentions, requires the patentee provide, among other things, "[a] chart identifying

specifically where and how each limitation of each asserted claim is found within each Accused Instrumentality." *Id.* at 3-1(c).  In determining whether to strike infringement theories under these rules, "[t]he dispositive inquiry" is "whether the allegedly undisclosed 'theory' is in fact a new theory or new element of the accused product alleged to practice a particular claim that was not previously identified in the plaintiff's contentions or whether the 'theory' is instead the identification of additional evidentiary proof showing that the accused element did in fact practice the limitation." *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 3640694, at *2 (N.D. Cal. June 11, 2015) (citing *Oracle Am., Inc. v. Google Inc.*, No. 10-CV-03561-WHA, 2011 WL 4479305, at *3 (N.D. Cal. Sept. 26, 2011)).  "If the theory is new, prejudice is 'inherent in the assertion of a new theory after discovery has closed.'" *Id.* (quoting *Adobe Sys. Inc. v. Wowza Media Sys.*, No. 11-CV-02243-JST, 2014 WL 709865, at *15 n.7 (N.D. Cal. Feb. 23, 2014)).

The Court finds that the two functions at issue here, as discussed in Dr. Madisetti's report, are akin to a "new element of the accused product alleged to practice a particular claim that was not previously identified in [ON's] contentions." *Id.*  Based on the infringement contentions, PI had no way of knowing that ON would rely on these functions, as opposed to the regulation of the current output, as bases for its infringement theories.  As this new theory was identified for the first time after the close of fact discovery, prejudice to PI is inherent.  Accordingly, the Court strikes the portions of the report asserting theories two and three.  The Court emphasizes again that ON does not dispute PI's arguments on these theories.

By contrast, ON disputes PI's representations with respect to theory one regarding Ohm's Law.  Dr. Madisetti asserts in his report that by maintaining the current output, the accused products necessarily maintain the voltage output at a desired value.  He states in relevant part:

> When LYTSwitch-3 devices are used as intended (e.g., constant current LED applications), they maintain very accurate output current regulation. Because the load is essentially constant, the output voltage will also be maintained "substantially at a desired value." A typical LED load includes an LED (i.e., a diode with a turn-on voltage) and some resistance.  Above the turn on voltage, the load exhibits essentially linear current-voltage characteristics. This means that for any desired current, there is a corresponding desired voltage needed to maintain that current. This is because, at voltage values above the turn-on voltage of the LEDs, the voltage across and

current through the LEDs will follow Ohm's law, which states V = IR (voltage equals current multiplied by resistance). Thus, for a given desired output current, $I_{desired}$, there is a corresponding desired voltage, $V_{desired} = I_{desired} \times R$. Accordingly, in operation, the LYTSwitch-3 maintains the output voltage substantially at a desired value.

Madisetti Report at 13.

PI argues that Dr. Madisetti's theory is unfounded because he "offers no evidence that LED lights follow Ohm's Law, and in fact it is widely recognized that diodes (including light emitting diodes, or LEDs) are *non-Ohmic*." PI Mot. at 15. PI then cites several secondary sources that state that diodes (including LEDs) do not satisfy Ohm's Law. *See id* (citing PI Mot., Ex. 37, ECF 224-38 (Sparkfun); PI Mot., Ex. 38, ECF 224-39 (Wikipedia); PI Mot., Ex. 39, ECF 224-40 (physicsnet); PI Mot., Ex. 40, ECF 224-41 (electronic-tutorials)). PI also submits evidence from both its technical witness and its expert, Dr. McAlexander, who each testify that LED lights are non-Ohmic. *See* Saint-Pierre Dep. Tr., at 190:16–19; PI Mot., Ex. 41, ("McAlexander Report") ¶¶ 256–258 ("It is important to note, however, that many circuit elements, unlike resistors, do not follow Ohm's law. These are called 'non-ohmic' elements. That is, Ohm's law does not apply to them and the associated current and voltage are not linearly related—in fact, they may not be related at all. One such device is the LED, or light emitting diode.").

ON's attempts to rebut these arguments and evidence are not convincing. First, it argues that based on the Court's claim construction "maintaining a constant output voltage is *not* a requirement of the claims." ON Opp. at 13. Of course, this is not correct on its face, as the Court's construction requires just that—that the product "form drive pulses that are used to *maintain the output voltage* substantially at a desired value." That the output voltage can change (though not substantially) does not mean that maintaining a constant output voltage is not required.

Second, ON argues that PI's Ohm's Law argument "is a distraction" because "[r]egardless whether an LED is considered an 'ohmic' or 'non-ohmic' device, there is no dispute that there is a defined relationship between voltage and current for an LED such that, for any given LED circuit, a controller that seeks to maintain the current at a desired value also necessarily maintains voltage substantially at a desired value." ON Opp. at 13. But this is precisely what PI's evidence *does*

refute. For example, PI's expert states that for non-ohmic devices "[t]here is no way to know the output current simply by knowing the output voltage, or vice versa—they are not dependent on each other." McAlexander Report ¶ 258. That is, there is no defined relationship between current and voltage. Moreover, ON's argument is disingenuous at best, given that Dr. Madisetti's argument *relies on* Ohm's Law, making it directly relevant to the arguments here. *See* Madisetti Report at 13.

Third, ON argues that Dr. Madisetti's report creates a disputed issue of material fact because he testifies that "[a]bove the turn on voltage, the load exhibits essentially linear current-voltage characteristics. This means that for any desired current, there is a corresponding desired voltage needed to maintain that current." ON Opp., Ex. A ("Madisetti Decl.") ¶ 18, ECF 235-2. It also argues that PI's secondary sources confirm this analysis, by showing that "above the turn-on voltage, the [current]-[voltage] curve for a diode is essentially linear (i.e., there is a straight-line relationship between voltage and current)." *Id.* at 14 (citing PI Mot., Ex. 38; PI Mot., Ex. 39; Madisetti Decl. ¶ 19). The handwaving in these arguments is remarkable. In the same breath, Dr. Madisetti relies on Ohm's Law—which at a constant resistance, requires a *linear* relationship between current and voltage—while also calling that relationship "essentially" linear. Madisetti Report ¶ 13. That is akin to saying the relationship is both linear and close-to-but-not-linear. Similarly, ON equates being "essentially linear" with a "straight-line relationship between voltage and current." ON Opp. at 14. Those two things are not the same.

To the extent he opines that Ohm's law governs above the turn-on voltage, Dr. Madisetti provides no evidence to support this position. Indeed, the only documents to which he cites (PI's secondary sources) do not support his position. Dr. Madisetti himself recognizes that the secondary sources show only that the current-voltage relationship is "essentially" linear. Madisetti Decl. ¶ 19. Again, that is not the same as being linear (and governed by Ohm's Law). And the secondary sources belie any argument that the relationship is linear. *See, e.g.*, PI Mot., Ex. 38 ("[Diodes] do not obey Ohm's law; the current is not proportional to the voltage . . . . The IV curve of a nonohmic device is a *curved* line." (emphasis added)); *cf.* PI Mot., Ex. 39 (hand-drawn graph not clearly linear). Thus, not only are Dr. Madisetti's assertions internally inconsistent, but

they are merely conclusory and unsupported by the evidence on which he relies. "In the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir.1981); *see also Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009). An expert's conclusory assertions are not sufficient to create a genuine issue of material fact. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 3630000, at *11 (N.D. Cal. June 2, 2015). To the extent Dr. Madisetti opines that the products infringe regardless whether Ohm's Law applies, he has not articulated why this would be so, much less rebutted PI's expert's arguments to the contrary.

For the same reasons, ON cannot succeed on its fourth potential theory under the doctrine of equivalents: that the products "perform[] substantially the same function (e.g., regulating the output from a power supply to the load) in substantially the same way (e.g., in response to a power signal and feedback signal, forming drive pulses to turn a switch on and off to control current on the primary side of a transformer) to achieve substantially the same result (e.g., providing a regulated supply of electrical energy to the load)." Madisetti Report at 10. ON has not submitted evidence from which a reasonable jury could conclude that "regulating the output from a power supply to the load" (here, the current output) is the same as "regulat[ing] the output voltage." There is no evidence that the products' function of regulating the output current is equivalent to regulating the output voltage.

Because PI has demonstrated that its accused products do not infringe claim 10 of the '601 Patent, and ON has failed to submit admissible evidence showing disputed issues of material fact, PI's motion is GRANTED.

### 5. Non-Infringement of ON's '272 Patent Because PI's Products Do Not Have an Internal Temperature Compensation Circuit

PI asks the Court to grant summary judgment of non-infringement of ON's '272 Patent because PI's accused products do not contain a "temperature compensation circuit," as required by the asserted claims. PI argues both that it has evidence demonstrating that the accused products do not practice the limitation and also that ON does not have any evidence that the accused products

infringe.  Because the Court agrees with PI's second argument—that ON does not have evidence of infringement—it does not reach PI's first argument.

The only evidence ON cites to support its infringement theory are its infringement contentions and Dr. Madisetti's report.  *See* ON Opp. at 15–16.  PI argues that the infringement contentions do not create a genuine issue of material fact and that Dr. Madisetti's opinion on the issue should be excluded under Federal Rules of Civil Procedure 26 and 37.  The Court agrees on both fronts.

First, PI notes that ON's infringement contentions contain no evidence for their conclusory assertions "on information and belief" that "the temperature compensation circuit is included in the 'Bias Generator' block in the figure below," referring to a block diagram in the contentions.  PI Mot., Ex. 43 at 2.  PI states that the block diagram does not relate to PI's accused products and is not a reference to PI's schematics, and that PI has no idea how the figure was generated.  PI Mot. at 18.  ON does not dispute that its infringement contentions do not contain any cited evidence to support their assertion that the accused products contain a temperature compensation circuit.  *See* ON Opp. at 15 (recognizing PI's arguments with respect to ON's infringement contentions and Dr. Madisetti's report, but responding only to the Dr. Madisetti argument).  Having reviewed the contentions, the Court agrees with PI that they do not contain evidence sufficient to create a triable issue of fact.  *Cf. Publishing Clearing House, Inc.*, 104 F.3d at 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

Second, PI argues that the report of ON's expert, Dr. Madisetti, likewise does not create a triable issue of fact because it is not supported by admissible evidence.  The only evidence to which Dr. Madisetti cites to support his infringement report is a "Chipworks Circuit Analysis Report for the LYT4311E ('Teardown')."  *Id.* at 1; *see also id.* at 1–9.  PI argues that this evidence is inadmissible under Federal Rule Civil Procedure 26(a)(1)(A)(ii) and Rule 26(a)(2)(B)(ii)&(iii) because ON did not produce the Teardown to PI during discovery.  *See* PI Mot. at 19; PI Reply at 10.  ON describes the report as the result of "a physical examination (including high resolution planar imaging)" of the accused product.  ON Opp. at 15.  Though ON states that it produced this

report to PI, *id.* at 15–16, PI notes in reply that ON only produced the Teardown on May 14, 2019, after PI filed its motion here and well after the close of fact discovery. PI argues that it would be prejudiced if the Court allowed Dr. Madisetti to rely on this undisclosed evidence because PI has not had the opportunity to take discovery on the Teardown or to depose anyone who created it. ON argues that PI is not prejudiced because it can use the Teardown in its deposition of and cross-examination of Dr. Madisetti. ON Opp. at 16.

The Court holds that Dr. Madisetti's opinion relying on the Teardown must be stricken as a sanction under Federal Rule of Civil Procedure 37 for ON's willful violation of Federal Rule of Civil Procedure 26.

It is undisputed that ON produced the Teardown after the close of discovery. And ON does not argue that the Teardown was "otherwise . . . made known" to PI "during the discovery process or in writing." Fed. R. Civ. Proc. 26(e). Nor does it appear that ON could make such an argument, because ON's infringement contentions do not identify the Teardown, PI Mot., Ex. 43, and elsewhere in its motion, PI indicates that Dr. Madisetti did not serve his infringement report until April 25, 2019, after the close of fact discovery, *see* PI Mot. at 15. Thus, ON violated Rule 26's disclosure requirements.

Under Rule 37, a party that fails to meet its obligations under Rule 26(a)&(e) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012). However, where the sanction of excluding evidence "amount[s] to dismissal of a claim," courts are "required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, and also to consider the availability of lesser sanctions." *Id.*

Though exclusion of this evidence will lead to dismissal of ON's only evidence in support of its infringement claim, and thus dismissal of the claim, the Court holds that such a sanction is warranted in this case. ON does not even attempt to justify its glaring failure to comply with its disclosure obligations. The Teardown is the foundational document to ON's theory of

infringement on this patent, and it is the type of document anticipated in the infringement contentions. There is simply no excuse for ON's failure to disclose this essential document so late in the litigation. This Court can only assume bad faith by ON in failing to disclose this document because ON easily could have sought leave of Court to reopen discovery to disclose the document once Dr. Madisetti relied on it as the sole basis of his expert report. Instead, ON waited not only until after the close of discovery, but also until after PI filed its summary judgment motion—forcing PI to spend time and resources briefing this issue. And even after PI's motion put ON on notice of its failure to disclose the document, ON still waited until two days before it filed its opposition to produce the document. This willful failure has severely prejudiced PI. With this case so close to trial, PI does not have the opportunity to take discovery on this foundational document or on Dr. Madisetti's opinions as supported by the undisclosed document. The Court has considered the option of a less harsh sanction and reopening discovery, but there is simply not sufficient time left before trial to allow PI to take the full range of discovery necessary to defend against this previously unsupported theory.

Thus, the Court concludes that Dr. Madisetti's opinion must be stricken under Rule 37 for ON's willful failure to disclose the foundational document underpinning that opinion during discovery. As such, Dr. Madisetti's opinion cannot create a genuine issue of material fact on this issue.

Because PI has demonstrated that ON does not have evidence to support its infringement theory, and thus that the there is no genuine dispute of material fact that it did not infringe, PI is entitled to judgment as a matter of law that its accused products do not infringe the '272 Patent. Thus, PI's motion on this issue is GRANTED.

### 6. Non-Infringement of ON's '933 Patent Because PI's Products Do Not Have a Memory Circuit

PI asks the Court to grant summary judgment of non-infringement of ON's '933 Patent because PI's accused products do not contain a "memory circuit," as required by the asserted claims. PI argues that neither ON's infringement contentions nor ON's expert Dr. Madisetti's report relies on evidence demonstrating that the accused products contain a memory circuit. PI

48

Mot. at 19–20. PI argues in a footnote that to the extent Dr. Madisetti accuses more specific circuitry in any of the products, his opinions accuse a "new element of the accused product alleged to practice a particular claim that was not previously identified in the plaintiff's contentions." PI Mot. at 20 n.4 (quoting *Finjan II*, 2015 WL 3640694, at *2).

The Court agrees with ON that PI has not sufficiently demonstrated that Dr. Madisetti's opinion asserts a new theory of infringement, and that Dr. Madisetti's report creates a genuine issue of material fact on this issue. Importantly, PI does not move for summary judgment on a product-by-product basis, *see* PI Mot. at 1, so ON need only demonstrate that there is a genuine issue of material fact on a single accused product. It does so for the DPA-Switch.

As PI points out, ON's infringement contentions as to the DPA-Switch state that "[o]n information and belief, the stop logic (dark green box) comprises a memory circuit." PI Mot., Ex. 47 at 3. Accompanying this statement is a diagram taken from DPA-Switch Data Sheet highlighting the alleged stop logic in dark green and identifying it as the memory switch. *Id.* at 1, 3. As the Court has held numerous times throughout this opinion, contentions based on information and belief are not sufficient to create a genuine issue of material fact.

However, Dr. Madisetti in his report confirms that the "stop logic (dark green box) includes a memory circuit," referencing the same diagram included in the contentions. PI Mot., Ex. 51 at 3. Moreover, Dr. Madisetti also provides testimony that includes detailed annotations of circuit schematics for the DPA-Switch product that Dr. Madisetti claims demonstrate that the DPA-Switch contains a memory circuit. *See* ON Opp., Ex. A at R-62, R-93–R-95. Dr. Madisetti testifies that he identified the memory circuit for the DPA-Switch in his annotations to the schematics, and that "[t]he 'memory circuit' identified on these schematic pages is within the circuit block labeled 'Stop Logic' in the DPA-Switch data sheet that is referenced in both the Madisetti Infringement Report and ON's infringement contentions for the DPA-Switch." *Id.* ¶ 9. That is, Dr. Madisetti testifies that the detailed schematics provide further evidence for the theory ON disclosed in its infringement contentions—that the "Stop Logic" of the DPA-Switch is a memory circuit. ON argues that because Dr. Madisetti simply provides further evidence for ON's original infringement theory, the evidence should not be stricken, and Dr. Madisetti's report

49

creates a genuine issue of material fact on this issue.  *See* ON. Opp. at 17–18 (citing *Finjan II*, 2015 WL 3640694, at *3).

PI in reply argues that "ON absolutely has changed its theory of infringement."  PI Reply at 10.  To support this argument, PI compares the original figure in ON's infringement contentions to a new figure that allegedly represents Dr. Madisetti's opinion, showing that Dr. Madisetti's opinion encapsulates more than just the "Stop Logic" as the memory circuit.  The new figure appears to be something PI created itself—Dr. Madisetti did not draft this figure.  PI then argues for an entire page of its brief how Dr. Madisetti's report identifies more than just the Stop Logic as the memory circuit, arguing for example that "Dr. Madisetti points to structures that are in totally different portions of the circuit from those identified in the contentions and to totally different signals as the alleged memory's output."  But PI does not cite to any evidence to support this argument, except for Dr. Madisetti's report itself.  PI does not cite expert opinion or other evidence to rebut Dr. Madisetti's testimony that his opinion is limited to the "Stop Logic."  It is certainly not clear to the Court from the face of these detailed technical schematics that Dr. Madisetti is pointing to portions of the circuit outside of the "Stop Logic" to support his opinion.  Without evidence or expert opinion to support PI's arguments, the Court cannot conclude that Dr. Madisetti changed ON's theory of infringement.  Instead, it appears he simply added greater detail to the theory, which does not provide a basis for striking it.  *See Finjan II*, 2015 WL 3640694, at *3; *see also Digital Reg of Texas, LLC v. Adobe Sys. Inc.*, No. CV 12-01971-CW (KAW), 2014 WL 1653131, at *5 (N.D. Cal. Apr. 24, 2014).

Because ON has provided evidence in the form of expert testimony that at least one accused product contains a memory circuit, the Court finds that there is a genuine issue of material fact as to whether the accused products infringe the '933 Patent.  PI's technical witnesses' testimony to the contrary simply demonstrates that the facts are disputed.  *See* PI Mot. at 20 (citing witness deposition testimony).

Because there is a genuine issue of material fact on this issue, PI's motion is DENIED.

### 7.  Non-Infringement of ON's '624 Patent Because ON Does Not Have Evidence of Infringement

United States District Court
Northern District of California

PI asks the Court to grant summary judgment of non-infringement of ON's '624 Patent because PI's accused products do not practice the following limitation of the asserted claims: "receiving a current reference signal representative of an inductor current for generating the variable reference signal." *See* PI Mot. at 20–21; PI Reply at 13; PI Mot., Ex. 55 at claims 6, 11, 15, and 20; *see also* ECF 196 (construing current reference signal to also mean compensation signal).

PI argues that ON does not have any evidence that PI's accused products practice this limitation. PI notes that after claim construction, the only product ON's expert alleges infringes is the LinkSwitch-4 product. *See* PI Mot., Ex. 56 at 4. As to the LinkSwitch-4 product, PI introduces evidence from its technical witness Mr. Matthews that "the current in the primary inductor is not used for generating the cable drop compensation" and the "current sense signal . . . is not part of the cable compensation circuit." PI Mot., Ex. 45 at 145:21–146:10; PI Mot., Ex. 45 at 136:8–146:10). Mr. Matthews also distinguished the product datasheet from more detailed schematics by saying "the connection in this block diagram is not an indication that the current sense is used in that cable compensation" because the "block diagrams in the data sheet . . . can be . . . very high level to give an impression to customers just, you know, how the circuit is working at a high level." *Id.* at 142:3–18; *see also id.* at 138:4–7 (distinguishing datasheet by saying "I know at a schematic level for the circuitry inside the LinkSwitch-4 is not related to the inductor current, the primary inductor current of the power supply"). PI also notes that Mr. Matthews relied on detailed technical documents to support his opinions; however, PI does not submit those documents here. PI then argues that ON's expert Dr. Madisetti does not rebut Mr. Matthew's testimony, but instead only offers conclusory opinions based on a datasheet block diagram that "the compensation signal is based on the CURRENT SENSE (CS) signal that is representative of the primary side inductor current" and that "[b]ased at least on the compensation signal, the compensation circuit . . . generates the variable reference signal." PI Mot., Ex. 58 at 30. PI argues that these conclusory allegations are not sufficient to rebut Mr. Matthews definitive testimony to the contrary.

In its Opposition, ON argues that Dr. Madisetti's testimony is sufficient to create a genuine

issue of material fact because the datasheet on which he relies is a detailed description of the product. ON then says that Dr. Madisetti demonstrates based on the datasheets that the compensation circuit receives a current reference signal that is representative of the inductor current. *See* ON. Opp., Ex. A at R-178–R-180. Dr. Madisetti points to various portions of the datasheet to support his opinions. *See id.* (citing Datasheet at 1 – 6 & Figs. 2–5). ON argues that Dr. Madisetti and Mr. Matthews simply disagree on this issue, which is not a basis for summary judgment.

The Court agrees with ON that PI's arguments go to the weight and credibility of the competing evidence, which the Court does not consider at summary judgment. The Court does not find Dr. Madisetti's opinions so conclusory as to merit exclusion. Put simply, PI believes that its evidence based on schematics is stronger than ON's evidence based on the datasheet. This represents a genuine issue of material fact for the jury to decide.

Because there is a genuine issue of material fact on this issue, PI's motion is DENIED.

### 8. Willful Infringement

Finally, PI moves for summary judgment of no willful infringement of any of ON's asserted patents. PI argues that ON only alleges willful infringement of the '624 and '709 Patents and that ON has never produced any evidence that PI had pre-suit notice of its infringement of those patents, such that ON cannot demonstrate willful infringement of those patents (or any others). PI Mot. at 22. ON argues that communications between ON and PI on September 25, 2014 provide evidence that ON notified PI of the '624 and '709 Patents prior to filing suit here. ON Opp. at 19–20. ON notes, however, that it believes this evidence does not constitute notice for either party and is inadmissible by either party under Rule 408, as it argued in its own motion. The Court rejected this argument in Section II.A.2, *supra*.

Though the Court held above that such evidence is not inadmissible under Rule 408 for purposes of notice, ON has not submitted any evidence to support its assertion that on September 25, 2014 ON informed PI of PI's infringement of the '624 and '709 Patents. ON focuses its motion on the June 2014 email, with only uncited references to the September communications. The only related evidence submitted by either party is (1) ON's infringement contentions (ECF

223-25 at 11; submitted by PI), which state that ON told PI of its infringement of the patents during the September 2014 meeting; and (2) a reference in Mr. Walker's deposition (ECF 220-11) to a PowerPoint ON gave to PI at the September meeting. ON does not submit a declaration about the September meeting or the presentation itself. As such, ON fails to submit any admissible evidence demonstrating that it notified PI in September 2014 (or any other time prior to filing suit) of PI's alleged infringement of ON's '624 or '709 Patents. And ON does not submit any other evidence or arguments in support of its claim for willful infringement.

Because PI has demonstrated the absence of any genuine issue of material fact as to its willful infringement of any of ON's asserted patents, and ON has failed to identify evidence that precludes summary judgment on this issue, PI's motion is GRANTED as to no willful infringement.

**III.    CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that:

**ON's Motion**

1. ON's motion for summary judgment that the asserted claims of the '623 Patent, the '533 Patent, and the '457 Patent are invalid for indefiniteness is **GRANTED**.

2. ON's motion for summary judgment that the damages period is limited to the time of filing of the relevant claims is **GRANTED** as to the '119 Patent and **DENIED** as to the '079, '876, and '471 Patents.

3. ON's motion for summary judgment of non-infringement of PI's '079 patent based on PI's disclaimer of claim scope during IPR is **DENIED**.

4. ON's motion for summary judgment of non-infringement of PI's '079 Patent due to failure to satisfy the "fixed switching frequency" claim requirement is **DENIED**.

5. ON's motion for summary judgment of invalidity of PI's '471 Patent due to anticipation by the '224 Patent to Krupka is **DENIED**.

6. ON's motion for summary judgment of non-infringement of claim 1 of the '876 Patent is **MOOT**.

**PI's Motion**

1. PI's motion for summary judgment that issue preclusion based on privity bars ON's validity challenges to PI's '876 and '079 Patents is **DENIED**.

2. PI's motion for summary judgment that IPR estoppel bars ON's validity challenges to certain claims of PI's '876 and '079 Patents is **DENIED**.

3. PI's motion for summary judgment of invalidity of ON's '862 and '908 Patents due to anticipation by PI's SMP3 product is **DENIED**.

4. PI's motion for summary judgment of non-infringement of ON's '601 Patent because PI's accused products do not regulate the output voltage is **GRANTED**.

5. PI's motion for summary judgment of non-infringement of ON's '272 Patent because PI's products do not have an internal temperature compensation circuit is **GRANTED**.

6. PI's motion for summary judgment of non-infringement of ON's '933 Patent because PI's products do not have a memory circuit is **DENIED**

7. PI's motion for summary judgment of non-infringement of of ON's '624 Patent Because ON does not have evidence of infringement is **DENIED**.

8. PI's motion for summary judgment of no willful infringement is **GRANTED**.

**IT IS SO ORDERED.**

Dated: August 7, 2019

_____
BETH LABSON FREEMAN
United States District Judge